## No. 2798.

### George Phillips v. The State

1. Murder—Conspiracy—Principal Offenders.—All persons are principals who are guilty of acting together in the commission of an offense, and this includes not only those who are present at the commission of the offense, but those who, though absent, are doing their part in connection with and in furtherance of the common design.

2. Same.—It is further provided by statute (Penal Code, art. 76) that "all persons who shall engage in procuring aid, arms, or means of any kind to assist the commission of an offense while others are executing the unlawful act, and all persons who endeavor at the time of the commission of the offense to secure the safety or concealment of the offenders, are principals, and may be convicted and punished as such."

3. Same.—It is also a well settled general rule that when several persons conspire or combine together to commit any unlawful act, each is criminally responsible for the acts of his associates or confederates, committed in furtherance or in prosecution of the common design for which they combine.

4. Same—Charge of the Court—Case Stated.—Evidence in this case tends to show that previous to the homicide the accused repeatedly declared his intention to kill the deceased, and that, on the evening of, but before the killing, he went to the house of deceased and told deceased's family to tell him that he and George Nixon, Aaron Nixon and Bill Evans were coming to his house that night to kill him; that about dark on that night the defendant and the said Nixons and the said Evans met at a certain house where they prepared arms and ammunition, and whence they went in the direction of the house of the deceased; that, just before the killing, George Nixon called the deceased from his house to the fence, and, while they were talking at the said fence, the defendant and the said Evans and one Buie, each having a gun, passed and stopped at a point forty yards distant, to which point the defendant called the deceased, and that when the deceased started to that point one or the other of the said parties fired upon and killed the deceased. Buie, testifying for the defense, admitted that he and the defendant passed the house of the deceased on the night of the homicide, and saw several negroes there, but denied that he or defendant stopped at or near the said house and witnessed the killing, or that they spoke to the deceased or any person then at his house. He testified further that he and defendant went to Wagoner's house, six miles distant, without stopping; that he did not hear the fatal shot fired, and was not informed of the homicide until the next morning. *Held*, that the evidence clearly raised the issue of conspiracy, and of the complicity of the defendant as a principal offender, and authorized the charge of the court on that issue, which, conforming to the rules above stated, was correct.

5. SAME—ACCOMPLICE—CASE STATED.—A well established principle of law is that it is the duty of the trial court to charge the jury upon every phase of the case made by the evidence, however feeble and inconclusive the supporting evidence may be. Another is that a defendant charged as a principal in a felony can not be convicted under such indictment as an accomplice. The testimony in this case presented two defensive theories: 1. That the defendant abandoned the conspiracy to kill the deceased. 2. That, having abandoned the formed design to kill the deceased his liability for his previous inculpatory acts was only that of an accomplice; or if, not having abandoned the formed design, he was not present and was not acting with his co-conspirators in the commission of the offense, he could be held liable, if at all, only as an accomplice, and if guilty as an accomplice, he could not be convicted under this indictment, which charged him as a principal offender. In refusing requested instructions upon these theories the trial court erred, inasmuch as they arose on the evidence at the trial.

6. SAME—BURDEN OF PROOF.—The defense requested the trial court to instruct the jury that "the burden of proof never shifts from the State to the defendant, but is upon the State throughout." *Held*, that the principle thus announced is elementary, and the court erred in refusing the instruction.

APPEAL from the District Court of Upshur. Tried below before A. B. Boren, Esq., Special Judge.

A life term in the penitentiary was assessed against the appellant upon his conviction in the first degree for the murder of Lewis Rhiden, in Upshur county, Texas, on the seventh day of August, 1882.

Emma Wagoner was the first witness for the State. She testified that the deceased was killed in Upshur county, Texas, on the night of August 9, 1882. He was then living on the Howard place, about ten miles east from Gilmer, on the Gilmer and Marshall road, and the witness was living with him. He received his death wound a little after dark, near his house, at which time the witness was about twenty yards distant from him. He was shot with a gun. Early in the morning of the fatal day, the defendant stopped at the house of deceased and inquired for him. He was told that the deceased had not yet returned from a place across the creek, to which he had gone. Defendant then said: "You tell Lewis Rhiden to get his gun and pistol ready, for I am going to kill him to-night, or hurt him d—d badly." About an hour before sun set, on the same day, defendant again came to deceased's house, again asked for deceased, and was again told that deceased had not got home.

He then said to witness and others present: "You tell Lewis Rhiden that he had better get his gun and pistol ready, for me and George Nixon, Aaron Nixon and Bill Evans are coming here to-night and kill him or hurt him d—d badly." The defendant then went on towards Mit Buie's house.

A short while after dark, George Nixon, armed with a gun, came to the yard fence in front of the deceased's house and called the deceased to him, the deceased having returned to his house about sun down. Deceased joined George Nixon at the fence, and sat down on the bars that served as a gate, Nixon leaning his gun against the bars. Within a few minutes, and while deceased and George Nixon were yet at the bars, the defendant, with Jim Buie and Bill Evans, came by, Buie and defendant riding horseback, and defendant and Evans armed with guns. As defendant passed the house, which he did within a few steps of where the deceased was sitting, on the bars, he said to deceased: "I want to have a talk with you, Lewis." Deceased replied: "Yes, I want to have a talk with you, too." He then got off the fence and "started from the gap or bars towards the defendant, Aaron Nixon, Bill Evans and Jim Buie; and George Nixon says: 'Come back Lewis, don't you go down there;' and when the deceased had gone about fifteen or twenty steps a gun fired. I saw the blaze of the gun, and the deceased fell dead in the road. Immediately I heard horses running down the road, east. Just before the gun fired, the defendant said to the deceased: 'God d—n it, I've got no time to talk to you now.' The defendant called the deceased out to the road to talk. It was in the night, but the stars were shining. I don't know who shot the deceased, but I think he was shot by somebody on horseback."

On her cross examination the witness said that she was unmarried, but had two children, one eight and the other ten years old, neither of which was the child of Boss Johnson. Boss Johnson brought the witness to court, and she paid him in money for doing so. The witness had no ill will toward defendant. On the contrary, she liked him. He married witness's sister. Defendant was not living with his wife, the witness's sister, at the time of the killing of the deceased. Witness lived with the deceased in the same house and in the same room at the time of his death. The house had but one room, and that was occupied by deceased, his wife, Albert Rhiden, Mary Wagoner and the witness, all of which parties worked on the

same farm.  Witness was at home all of the day of the killing.
Defendant came to that house three times on that day—in the
morning, in the evening and at night.  When he came there in the
morning he said that he was hunting his child.  He said noth-
ing about the child when he came to the house in the evening.
Witness was standing by the chimney, resting from her labors
at the wash tub, when the defendant first came to the house on
the fatal day.  He called her to him and asked where the de-
ceased was.  She told him that deceased had gone across the
river, and advised him to go on to wherever he was going, as
he might get into trouble he could not get out of.  She advised
him because he was her brother-in-law.  She was not angry
with him for separating from her sister.  When he came to the
house just before the shooting, that night, the defendant asked
the deceased to help him hunt for his child.  Deceased replied
that he was then sick, but if defendant would postpone his
search until morning he would join him in his search for his
wife and child.  Deceased got home from across the river about
sun set on that evening, and the witness told him about the vis-
its of the defendant, and delivered to him the messages left by
the defendant.  The defendant was riding his horse in a fast
walk when he came to the deceased's house on the night of the
killing.

Continuing, on her cross examination, the witness said that
she testified at the inquest upon the body of the deceased, and
that her narrative before that tribunal was substantially the
same as that upon this trial.  The inquest was held on Tuesday,
the day after the killing.  Witness had no clock, nor watch,
and was unable to testify as to the hour when the killing oc-
curred, but it was early in the night and not long after dark.
The stars were shining bright enough to enable the witness to
see and identify the parties and the horses, and to see the guns,
of which one was in the hands of the defendant.  Deceased
had walked ten or fifteen steps toward defendant when the gun
fired.  Defendant was then sitting on his horse in the middle
of the road.  Witness was then standing about half way be-
tween the house and the bars, or about ten steps from each.
George Nixon started down the road toward defendant imme-
diately after the deceased did, but had taken only a few steps
when the gun fired.  The witness heard George Nixon tell de-
ceased not to go down the road toward defendant, and she
heard him, just after the fatal shot was fired, call loudly for

Mit Buie. Witness did not see George Nixon catch the deceased in his arms as the latter staggered to his fall, but she heard the said Nixon say that he did catch him. She did not testify, either at the inquest or on George Nixon's trial, that she saw the said Nixon catch the deceased as he fell. She saw the flash from the gun when it was fired, but she did not know who fired it, further than that it was fired by one of the parties in the road. The witness had not been to bed when the killing occurred, nor did she go to bed that night, but with the crowd that gathered she sat up until morning with the corpse. She did not make a complaint or affidavit against the defendant a few days before the killing.

Albert Rhiden, the brother of the deceased, was the next witness for the State. He testified that the Howard farm place, on which the deceased was killed, on the night of Monday, March 9, 1882, was situated in Upshur county, Texas, about ten miles east from Gilmer, and on the Gilmer and Marshall road. Deceased's house, a single room log cabin, was situated on the south side of that road. Mit Buie's house was situated a short distance west from deceased's house, and Dunbar's house was a short distance east. There was a field on either side of the deceased's house, one a corn and the other a cotton field, and the house stood just inside of one of the fields. The two fields were separated by a lane between twenty and thirty feet wide. The defendant came to the deceased's house on the Saturday night preceding the homicide, some time after the inmates had gone to bed. He had his gun with him, and kicked against the door and called for the deceased. Witness got up and asked him what he wanted. He replied that he wanted to see Lewis Rhiden. Witness told him that Lewis was not at home. Defendant then said that he intended to kill Lewis Rhiden. The defendant next came to the house of the deceased, when the inmates, save the deceased, were at breakfast, on the morning of the fatal day, which was the Monday following. He came again, in company with George Nixon, about sun set on the same day, and thence he and George Nixon went towards Mit Buie's house. About dark that night, George Nixon, armed with a gun, came to the house of the deceased, stood his gun up against the bars and called the deceased to him. Soon afterwards the defendant and Jim Buie, riding horses, and Bill Evans on foot, defendant and Evans being armed with guns, came by the house. At that time deceased was at the bars

with George Nixon, and witness, the deceased's wife, Emma
Wagoner and Mary Morgan were about the premises. As he
passed the house, at a short distance from the bars, the defend-
ant told deceased that he wanted to have a talk with him. De-
ceased replied that he, too, wanted to have a talk. Defendant,
Jim Buie and Bill Evans then passed on to a point in the road
about forty yards beyond the house, and stopped. Defendant
then called the deceased, and deceased started towards the
party, and had almost reached it when the fatal shot was fired.
Witness, who was standing about twenty steps distant, heard
the report and saw the flash of the gun, but was unable to say
by whose hand it was fired. He thought, however, that it was
fired by one of the parties on horseback, who immediately
turned their horses and fled rapidly towards Dunbar's house.
The defendant and George and Aaron Nixon and Bill Evans were
afterwards arrested for the murder of the deceased. George
Nixon is now in the penitentiary. The defendant, Aaron Nixon
and Bill Evans escaped afterwards in a general jail delivery.
Defendant was rearrested in Arkansas, about nine months prior
to this trial, and Aaron Nixon and Bill Evans were still at
large.

Cross examined, the witness said that the defendant, Bill
Evans, George Nixon and Jim Buie were personally present at
the time of the killing. George Nixon came to the house
about ten minutes before defendant, Evans and Jim Buie did.
The tragedy occurred in the road, about twenty-five yards from
the house of the deceased. Witness at that time was in the
yard between the house and the bars. He went to that point
because he was apprehensive that the said parties would shoot
the deceased.. Witness had no fire arm at that time. When
defendant reached the point in the road opposite the bars,
just before the shooting, he said to deceased: "Lewis, By God!
I want to see you!" Deceased replied: "I want to see you too."
Defendant, Buie and Evans went a few steps further and stop-
ped, when defendant called to deceased to come to him. Just
before the fatal shot was fired, witness heard the defendant
say: "By God! I haven't got time to talk to you." Deceased
had no gun when he was shot and killed. When he started
down the road to where defendant, Jim Buie and Evans were,
George Nixon said to him: "Lewis, don't go down there; come
back." George Nixon's gun was then leaning against the fence
or bars. In reply to George Nixon, the deceased said: "I am

going down there to talk to George." The witness saw the three persons in the road at the very time the fatal shot was fired, but, as before stated, he was unable to say which one of them fired the shot. Witness did not think that the shot was fired from the inside of the field. He was satisfied it was fired from the road. Witness ran into the house as soon as the shot was fired. He did so because Mary Wagoner (previously referred to by witness as Mary Morgan) told him that the parties had said that they intended to kill him as well as the deceased. He was in the house when told that the shot had killed deceased. The witness knew that the defendant was at deceased's house at least three times on Sunday, the day before the homicide, and twice on that day before the homicide occurred. When he came to the house just before sun down of Monday, and was informed that deceased had not yet come home, he said that he was going to get a crowd and go to Hamp Wagoner's and get his child. Defendant and deceased had been quarreling and fussing for some time previous to the killing. The State's witness Emma Wagoner lived part of the year 1882 with the defendant, but left his house some time before the killing, and was living with the deceased at the time of his death. Witness testified before the inquest on the morning after the killing, and again on the subsequent trial of George Nixon.

Mary Rhiden testified, for the State, that she was present and witnessed the killing of the deceased, which occurred on the road, near his house, about an hour after dark, on the night of Monday, August 9, 1882. A short time before sun set on the fatal day, the defendant came to deceased's house, and said to those present: " Tell Lewis Rhiden that I am going to kill him or hurt him d—d badly before morning." About an hour after dark George Nixon came to the house and called the deceased to the bars. He had his gun with him. About ten minutes later the defendant and Jim Buie, riding horseback, and Bill Evans walking, all of them armed with guns, came by the house. As he passed, the defendant said to the deceased: "Lewis, by God, I want to see you." Deceased replied: "I want to see you, too, but you seem to be in a mighty hurry." Defendant, Jim Buie and Bill Evans went on to a point about forty yards beyond the house, and stopped. Defendant then called deceased to come to him. Deceased started, when George Nixon, who was still at the bars, advised him not to go. De-

ceased, however, said that he wanted to talk to defendant, and started down the road toward the parties. Just before he reached them the defendant said: "By God, I have not got time to talk to you now," and the fatal shot was fired. The parties then ran off down the road.

Cross examined, the witness said that she was now the wife of Albert Rhiden, but was not married to him at the time of George Nixon's trial. She was at that time in Shelby county, and did not testify on the trial of the said George Nixon. She did, however, testify on the inquest over the body of the deceased. Witness did not know which of the several parties fired the fatal shot, but she knew that all of them had guns. When defendant came to the house on the fatal night he asked deceased to go with him to hunt his child, and said that George and Aaron Nixon, Bill Evans and Jim Buie were going with him. The inmates of deceased's house went to the deceased after he fell. Witness did not get frightened, nor did Albert Rhiden get scared and run into the house. Witness had talked about this tragedy to Albert Rhiden and his mother, since they were notified to attend this trial, and she and her said husband agreed as to the facts of the transaction.

Ben Rhiden, the son of the deceased, testified, for the State, that he was at the house of Jim Phillips on the evening of the fatal Monday, when the defendant and the wife of Bill Evans came to that house. Bill Evans, George Nixon and Aaron Nixon came to said house a few minutes later, and defendant asked Bill Evans: "Have you got that buckshot?" Evans replied that he had two loads. Defendant then, with the assistance of George and Aaron Nixon, attempted to draw the loads from his gun, but failed. Defendant then said: "They are all right; they will suit my purpose." Shortly afterwards the said parties, viz.: defendant, Bill Evans and George and Aaron Nixon, left Jim Phillips's house and went off towards the house of the deceased. George Nixon, who was a little slow about starting, said: "Boys, this is a mighty particular matter we are going into." Defendant replied: "Yes, but come on. The one that crawfishes out of this business, we will all turn on him." On his cross examination the witness said that it was about dark when defendant, the Nixons and Evans left Jim Phillips's house. It was about a mile and a half from that house to Mit Buie's house. The said parties did not ask witness to go with them, nor did they tell him where they were going.

He did not hear of the killing of his father until next morning between day light and sun rise. He was present at the inquest, but was not placed upon the stand, nor did he testify on the examining trial of the defendant and his associates.

Alex Cabiness was the next witness for the State. He testified that he lived about two miles distant from the house of the deceased at the time of the killing, but in Gregg county, and was the justice of the peace of his precinct in said county. On the evening before the killing, the defendant and Bill Evans came to the witness's house and borrowed two loads of buckshot. Witness went to the house of the deceased on the next morning, and saw the body of the deceased lying in the road about forty yards from the house. From appearances the witness thought the deceased was killed by a load of buckshot, the charge taking effect in the breast, and scattering from the neck to the waist. Witness remained at the house all day, and saw all of the negroes of the settlement at the place, at one time or another, except the defendant, Aaron Nixon and Bill Evans.

On his cross examination, the witness said that he knew the State's witness, Emma Wagoner. She lived with the deceased at the time of the killing. She had trouble of some kind with the defendant some time (witness did not know how long) before the killing, and came to witness to procure his arrest. She, however, left without making a complaint or affidavit against him. Justice of the Peace Jones, of Upshur county, held the inquest upon the body of the deceased, and witness testified on that proceeding. The witness examined the ground at and about the place of the killing. He found the tracks of a person in the corner of the fence on the inside of the field which was on the opposite side of the road from deceased's house. That corner and those tracks were about twenty yards distant from where the body of the deceased was lying. He also found a piece of paper on the weeds near the said fence corner, and another piece of the paper on the shirt front of the deceased, which last piece appeared to be a part of the first piece, and both pieces being powder burned, the witness thought they had been used as gun wadding and fired from a gun. Tracks showed that the person who stood in the fence corner traveled in a semi circle from that corner to a point in the road about two hundred yards distant from where the body of the deceased was seen by the witness. The witness was well acquainted with Aaron Nixon, who worked on his farm, and was

satisfied that the tracks he saw in the fence corner were the tracks of Aaron Nixon. The defendant, who then lived on the witness's place, was at witness's well about sun down on the fatal Monday evening, and was arrested on the witness's place on the next evening. On the succeeding Friday the witness went with the constable in search of Aaron Nixon, and found him at the house of his brother-in-law, near Marshall, in Harrison county, about thirty miles from the scene of the killing. Aaron was taken to Gilmer and placed in jail with defendant, whence he escaped, and he has not since been seen by the witness. The witness heard the testimony of Emma Wagoner, both at the inquest and on the trial of George Nixon. She testified on both of those cases substantially as she testified on this trial. At the inquest the said Emma testified that, on the night of, and after, the killing she heard George Nixon say that he caught the falling body of the deceased in his arms after the shot was fired; and that said Nixon, in the same conversation, said something about telling deceased that he, Nixon, heard something moving about in the field, and that it was a hog. Jim Buie's reputation for truth and veracity in the community in Upshur county, where he lived five years ago, was good. The said Buie now lives in Hunt county, and witness did not know what was his present reputation for truth and and veracity in Hunt county.

The State closed.

Jim Buie was the first witness for the defense. He testified that he was at the house of his brother, Mit Buie, on the evening of the fatal Monday. He went to that house early in the morning and remained all day. Late on the evening of that day the defendant came to Mit Buie's house and asked the witness to go with him to hunt for his child. He wanted to go to Ned Wagoner's house, which was in Gregg county, about six miles distant. Witness consented to go with the defendant, and sent him to the lot to catch and saddle the horses. They started from Mit Buie's about sun down, neither of them having a gun. Just before witness and defendant started, three negroes came to Mit Buie's gate and called the defendant, who joined them at the gate and talked to them for a short while. None of those negroes had guns at that time. Witness did not hear what was said by any of the parties at the gate, nor did he recognize either of the three negroes. Shortly after those negroes left, the witness and defendant left Mit Buie's to go to

Wagoner's, and as they passed the deceased's house the witness saw some negroes in the yard, but did not recognize them. He and defendant went on direct to Ned Wagoner's house, six miles distant, where they remained perhaps thirty minutes, and then started back. They traveled together on their return journey until they reached the house of Billy Plummer, about a mile distant from the deceased's house, where witness stopped and stayed over night, and defendant went on toward the house of the deceased. Defendant was with the witness from the time they left Mit Buie's house until, having been to Ned Wagoner's and remained half an hour, they got as far back toward their starting point as Billy Plummer's house. Witness did not hear of the killing of deceased until the next morning. He did not hear the report of a gun on that night, either while near the deceased's house nor before or after he passed it, nor did he testify on the inquest that, soon after passing the house of the deceased, he heard a noise that he took to be the report of a gun or the crash of a falling tree.

Cross examined, the witness stated that at the time of the killing he lived beyond Cypress creek from the deceased's house about three miles. He was raised in that neighborhood and knew most of the negro residents, but did not know either of the Nixons or Bill Evans. He did not know whether or not George and Aaron Nixon and Bill Evans were the negroes who called the defendant from Mit Buie's house to the gate, as stated, nor whether they were of the party of negroes he saw in the deceased's yard when he passed his house a short while afterward, but he did know that three of the negroes in the crowd in the deceased's yard at that time were the same three who, a short while before, called the defendant from Mit Buie's house to the gate. Shortly after the killing of deceased the witness moved to Hunt county, and was not present on the trial of George Nixon. Witness could not recall the time of day he arrived at his brother's house on the fatal day. Defendant came to that house about sun down, and about fifteen minutes later came into witness's room and said to witness: "Mr. Buie, I want you to go with me to hunt my baby." Witness thought nothing strange of that request, and consented at once to go with him, and sent him to the lot to saddle the horses. The witness moved from Upshur to Hunt county for no other reason than that his wife owned land in the latter county.

Ike Stephens testified, for the defense, that he was a member

of the coroner's jury on the inquest upon the body of the deceased, and was one of the audience at the trial of George Nixon. He heard the testimony delivered by Emma Wagoner on both of those proceedings, and it was substantially the same narrative that she detailed on this trial. She said nothing on the trial of Nixon or at the inquest about a hog in the field. George Nixon was sitting by the body of the deceased, fanning off the flies, when witness reached the scene of the killing on the morning after it occurred. The body of the deceased was then lying in the middle of the road. "I saw the appearance of some person having got on the fence near where deceased was lying—as though deceased had stepped on the rails of the fence, leaving on the fence rails dust that had attached to his shoes in the road." Witness did not remember whether or not Albert and Ben Rhiden were examined as witnesses on the inquest. Re-examined, the witness said that Jim Buie belonged to the Baptist church at the time of the killing, and at that time his reputation in that community for truth and veracity was good. He knew nothing about his present reputation in Hunt county.

John Buie testified as did the witness Ike Stephens as to the general reputation of the witness Jim Buie for truth and veracity. The said Jim Buie was a first cousin of the witness.

P. H. Daniel, a cousin of Jim Buie, testified as did John Buie regarding the general reputation of Jim Buie for truth and veracity, and, in addition, that he was present at the trial of George Nixon, and heard the testimony of a certain yellow woman whose name he did not know. She testified that, on the morning after the killing, George Nixon told her that when the defendant stepped in the road and called deceased to come to him, and deceased started, he, George Nixon, told deceased not to go, and that deceased told him in reply that he, deceased, "was not afraid of any d—d man." She testified also that the said George Nixon called to Mit Buie to bring a wagon and take deceased's body to the house.

Jim Plummer, the brother of Billy Plummer, referred to in the testimony of Jim Buie, testified for the defense, that the reputation of Jim Buie for truth and veracity, while he lived in Upshur county, was good. He knew nothing about his present reputation in Hunt county. Cross examined, the witness said that he lived about a mile east of the house of the deceased at the time of the killing. Jim Buie did not stay at

the witness's house on the night of the killing, nor did the witness see him on the fatal day or night. Witness's brother, Billy Plummer, the person referred to by Jim Buie in his testimony, was unmarried at the time of the killing, and lived in a house with his mother, near the house of the witness. The said Billy Plummer was now dead.

All of the parties named in this report, except the witnesses Cabiness, John and Jim Buie, Ike Stephens, Daniels and Plummer are negroes.

The refused instructions referred to in the fifth head note, and discussed elaborately in the argument for the appellant, read as follows:

No. 3. * * "The defendant asks the court to charge the jury that an accomplice is one who is not present at the commission of an offense, but who, before the act is done, advises, commands or encourages another to commit an offense, or who agrees with the principal offender to aid him in committing the offense, or who prepares arms or aid of any kind prior to the commission of an offense, for the purpose of assisting the principal in the execution of the same.

"You are further charged, gentlemen of the jury, that the defendant, George Phillips, being charged as a principal offender, he can not, under the law of this State, be convicted as an accomplice.

"If you believe from the evidence that the defendant is guilty as an accomplice under the law as before given, you will find him not guilty; or, if you believe defendant guilty from the evidence, but have a reasonable doubt whether he is guilty as a principal or as an accomplice, you will find the defendant not guilty.

"The defendant is presumed by the law to be innocent until his guilt is established by legal evidence, and if from the evidence before you, in this case, you have a reasonable doubt as to the defendant's guilt, you will acquit him.

"The burden of proof never shifts from the State to the defendant, but is upon the State throughout."

Special Charge No. 4. * * * "You are further charged that the defendant, George Phillips, being charged as a principal offender, he can not under the code of this State, be convicted as an accomplice."

*Peet & Crosby*, for the appellant: The law of principals, as applicable to the facts proved, should be given to the jury. In

other words, the charge should apply the law of principals to the evidence before the jury. In this case, the charge of the court, in defining principals, gives the abstract definition of principals as found in articles 74, 76 and 78 of the Penal Code, and then, in attempting to apply the law to the facts of the case, the court charges the jury that if they find that appellant was present, and aided by acts or encouraged by words, as contained in article 75 of the Penal Code, or if appellant was not actually present, but kept watch, etc., under said article, thus assuming that Lewis Rhiden was killed, and that the killing was murder, now, where is the evidence to authorize such a charge? Where is there any evidence that appellant kept watch while others killed Lewis Rhiden? As well might the court charge the matters and things that make him a principal under article 77 of the Penal Code, or any of the other articles making one a principal. The court did not correctly charge the law applicable to principals. (13 Texas Ct. App., 406; 15 Id., 1; Id., 139; 22 Id., 464.)

Again, the court charged that "all persons are principals who are guilty of acting together." What is to be understood by this charge? Does the jury understand? Is the enunciation of this abstract principle sufficient? What is acting together in the meaning of the law; and when should the acting together be? It is limited to the time of the commission of the offense—not an hour before or after. The court ought to have applied this law to the facts of the case; otherwise the jury would not understand. (Authorities supra.) A bill of exception was taken to the charge of the court upon this point.

Again, the court charges the jury in this connection that before they can find the defendant guilty as a principal offender in the killing of the deceased (assuming that he was killed), they must believe that defendant was engaged in and acted together with the person or persons who killed the deceased in pursuance of a common purpose, and that the death of Rhiden was the result of a common design to do an unlawful act. Under such a charge, if the purpose and understanding is between A B and C to whip a man (an unlawful act), and death is the result, although A might abandon the purpose of whipping after the execution in part of his purpose, would A be guilty of murder? We think not. (15 Texas Ct. App., 629.)

The objection is that the charge makes all persons **principals**

who conspire to do an unlawful act, although they may abandon the furtherance of the conspiracy. (15 Texas Ct. App., 629.)

The court, concluding its charge upon principals, says: "The true test is, did the parties act together, and was the act done in pursuance of a common design and purpose in which their minds had agreed; * * * and if you are not satisfied beyond a reasonable doubt that the defendant was a *principal* in the taking of the life of Lewis Rhiden (assuming that his life was taken, and that defendant did it, the only question being whether he was principal or not), you will find defendant not guilty."

It appears from this charge that the true test is (and the court so charges), did the parties act together (whether as principals, accomplices or accessories, makes no difference), and was it in pursuance of a common design? This is made the ultimate test. We submit that this charge is error, and fundamental error.

The court erred in failing to charge the jury upon the law of accomplices, to define an accomplice, and give the law thereof as applicable to the facts of this case, as requested by defendant. The law of accomplice is a part of the law arising out of the facts of this case, and should have been given in charge to the jury.

A theory presented to the jury and testified to by some of the witnesses was that appellant was not present at the time that Lewis Rhiden was killed, and in fact alibi was the defense relied on. If the defendant was an accomplice he could not be convicted, being charged as a principal. (10 Texas Ct. App., 131; 17 Texas Ct. App., 61; 18 Texas Ct. App., 632-637.) Or if there was a reasonable doubt of the fact, the law of accomplices should have been charged and the defendant would have been entitled to an acquittal. (10 Texas Ct. App., 230; Id., 400.) The appellant requested a charge upon both of these phases of the case, the refusal of which was error.

The witness Cabiness testified that Lewis Rhiden was shot from inside of the field. The witness Stephens testified that he saw tracks on a rail on the outside of the fence, near where Rhiden fell; that a track found inside of the field in the corner of the fence circled around to the road; that said track corresponded with Aaron Nixon's track; that Aaron Nixon ran off and left the country immediately. Jim Buie testified that the defendant had no gun, and was not at, and did not do, the kill-

ing of Lewis Rhiden. In view of this testimony the law of ac-complice testimony and of reasonable doubt as between princi-pal and accomplices should have been given in charge to the jury.

The court having charged affirmatively that if appellant acted together with others, etc., it should have submitted to the jury the negative of this proposition, to wit, that if he did not act together, etc.; and further, the court having charged with reference to a conspiracy between appellant and others, it should have gone on further and charged the law with refer-ence to the appellant having abandoned the design of killing Rhiden after entering into a conspiracy.

The charge of the court making the appellant a principal by reason of certain acts, etc., was calculated to mislead the jury into assuming the facts to be true, unless the court had also charged the negative of the proposition. There was evidence before the jury that appellant, at the time of the killing, was en route to, or at, Wagoner's house, after his child; had no gun, and was not present, and did nothing that would make him a principal. (44 Texas, 473; 2 Texas Ct. App., 450; 17 Texas Ct. App., 602; 7 S. W. Rep., 867.)

A party who entered into a conspiracy to commit an offense, and who, before the offense is actually committed, abandons the enterprise, and the offense is subsequently committed by the remaining conspirators, in furtherance of their original de-sign and purpose, the party abandoning the design would not be guilty, and is not a principal thereto.

Now, conceding a conspiracy between appellant and others to kill deceased, yet, if afterwards appellant concludes to go after his child and abandon the conspiracy, and did go with Jim Buie after his child, he would not be a principal, and is not guilty, although the other conspirators may have killed de-ceased, according to the original plan. (Harris v. The State, 15 Texas Ct. App., 629.)

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Though appellant has been con-victed upon an indictment charging him alone with the murder of Lewis Rhiden, the testimony shows that several other parties were connected with and implicated in the killing. There is no positive testimony identifying the party who actually fired the

fatal shot, and whilst all the State's witnesses testify to the personal presence of this defendant, and place him in position and surround him with circumstances that lead almost irresistably to the conviction that with his own hand he committed the murder, he, on the other hand, has proven by the positive testimony of his principal witness that he was not only not present, but that he was so distant he could not have heard the fatal shot by which the murder was committed. This witness was a white man—all the other parties present at the time, witnesses and participants, being negroes. The murder was committed at night, sometime after dark.

Inasmuch as the most serious questions arising upon this appeal relate to the correctness and sufficiency of the charge of the court to the jury with reference to conspirators and principal offenders, it may be well to state the substance of the uncontradicted and undisputed facts showing specifically the defendant's relation to the homicide. It appears that appellant's infant child had been taken by some one and spirited away—when, and under what circumstances does not appear, nor does it appear what supposed connection, if any, deceased had with the abduction and concealment of the child. The homicide was committed on Monday night. On the previous Saturday night defendant went to the house of deceased with a gun, after the family had gone to bed, inquired for deceased, and, when told he was not there, said he intended to kill him. On Monday defendant was at the house of deceased three times; on the first occasion early in the morning, and when told that deceased was not there he told the family to tell deceased that he intended to kill him that night. About an hour by sun he again appeared at the house, and being told that deceased had not returned, said: "Tell Lewis Rhiden that he had better get his gun ready, for me and George Nixon, Aaron Nixon and Bill Evans are coming here to-night and kill him or hurt him d—d badly." Sometime after this the defendant passed deceased's house, and the latter being at home the defendant asked him to help him hunt his child, when deceased said that he was sick, but if defendant would wait till morning he would go with him to hunt his wife and child. As defendant was leaving he said that George Nixon, Aaron Nixon and Bill Evans were going with him. That same evening all the last named parties and the defendant met at the house of Jim Phillips, where they were preparing arms and amunition, and about dark started off towards

the house of deceased, and when George Nixon said "boys this is a mighty particular matter we are going into," defendant said "yes, come on, the one that crawfishes out of this business we will all turn on him." Defendant's witness, the white man, Jim Buie, says that some negroes came to Mit Buie's, where he and defendant were, and called defendant out and talked with him just before the witness and defendant were about to start off on horseback to hunt for defendant's child, but that he does not know whether they were George Nixon, Aaron Nixon and Bill Evans or not—the witness was near sighted and could not see well at a distance—but that these same parties, whoever they were, were at the house of deceased when he and defendant passed the house going to Ned Wagoner's, six miles distant, in search of the child. There is but little, if any, conflict in the testimony up to this point.

The State's witnesses say that, just before the killing, George Nixon came to the fence in front of the house and called deceased out, and that these two were sitting on the fence talking when Jim Buie, Bill Evans and defendant passed by, all armed, and defendant told deceased he wanted to see him, and deceased replied, "I want to see you, too." That, after having gone about forty yards the parties stopped in the road and defendant called to deceased to come down there. That deceased started but was shot by some one of the parties in the road; that is, by Jim Buie, Bill Evans, or defendant.

Defendant's witness, Jim Buie, positively denies that he and defendant either said anything to deceased or any one else as they passed; denies that they stopped and witnessed the shooting; denies that they even heard the report of the gun which did the killing; and further, testified that he, the witness, did not hear of the killing until the next morning; that defendant was with him all the time; that they went six miles to Wagoner's and returned back to Plummer's, within a mile of the place of the homicide, together. There is other evidence which tends to show that the shooting was done from a fence corner inside the field, and by Aaron Nixon, who, it will be observed, was not seen with the other parties at the house of deceased about the time of the shooting.

From the facts we have detailed we think it is reasonably apparent that a conspiracy was deliberately entered into between Aaron Nixon, George Nixon, Bill Evans and this defendant to take the life of Lewis Rhiden. It is also equally ap-

parent that such conspiracy was formed in the interest and at the instance of this defendant. He, it seems, had determined and repeatedly declared his intention to kill deceased. He is the only one of the parties who had any such motive, or who had ever declared such intention. In entering into the conspiracy and participating to the extent they or either of them went in its consummation, the other parties appear to have been actuated solely by their friendship for defendant. He seems to have been the very head and front of the conspiracy, and, to say the least of it, was the most active leader and participant up to and within but a short time of its consummation. If there is any evidence of an abandonment upon his part, it consists in the fact, if it be a fact, that he did not stop to consummate or be present at its consummation, but went on with Jim Buie out of sight and hearing of the deed, and his going on with Buie, instead of being evidence of abandonment, may be equally as strong evidence to convict him as a principal in the murder.

Suppose Buie to have been all that is claimed for him by the defense—an upright, truthful, honest, Christian citizen, who would be so far from engaging in the conspiracy himself as that he would do all in his power to prevent its accomplishment, and that this fact was known to defendant and his confederates, what more reasonable and natural than that they should arrange to have him absent at the denouement, so that he should not be able to prevent nor be able to testify against the parties engaged in it, and what more plausible reason could be had to get him away than for defendant to urge him on and accompany him to Wagoner's in pretended search of the child. In furtherance of the conspiracy it may have become necessary that appellant should have taken Buie away from the scene in order to conceal the crime and its perpetrators and the fact of his own complicity in it. If so, then he was a principal, though not present at its commission.

"All persons are principals who are guilty of *acting together* in the commission of an offense." (Penal Code, art. 74.) Not alone those who *are present,* but all who *are acting together·* in its commission. *Actual presence* is not necessary if at the time· of commission the absent party is doing his part in connection with and furtherance of the common design. (Willson's Crim. Stats., sec. 142.) Again, it is expressly provided by statute that "all persons who shall engage in procuring aid, arms or·

means of any kind to assist in the commission of an offense while others are executing the unlawful act, and all persons who endeavor at the time of the commission of the offense to secure the safety or concealment of the offenders, are principals, and may be convicted and punished as such." (Penal Code, art. 70.)

It is also a familiar general rule that when several parties conspire or combine together to commit any unlawful act, each is criminally responsible for the acts of his associates or confederates committed in furtherance or in prosecution of the common design for which they combine. (Bowers v. The State, 24 Texas Ct. App., 543; Kirby v. The State, 24 Texas Ct. App., 14; Williams v. The State, Ala., 9 Crim. Law Mag., 480; Willson's Crim. Stats., sec. 151.)

So much for the State's theory of the case, and it may suffice to say that the charge of the court was substantially correct in presenting the law applicable to this theory.

But, on the other hand, there were two theories insisted upon for the defense, first, abandonment of the conspiracy by defendant, and, second, that, having abandoned the former design to kill Rhiden, all the inculpatory acts proven against appellant prior thereto, if he could be held liable for them at all, in any manner after such abandonment, or if, without abandonment, he was liable for them, he not being present at nor acting with his co-conspirators in the killing, he would be liable as an accomplice (Penal Code, art. 79), and not as a principal, and if as an accomplice, that then he could not be convicted under the indictment, which charged him alone as a principal offender. Special instructions covering these phases of the defense were requested for defendant and refused by the court, and bills of exceptions saved to the refusal.

It was error for the court to refuse these instructions, because, whatever might have been the opinion of the court as to the truth or merit of the defenses, they presented matters of fact supported to some extent at least by the evidence. "In all criminal cases the jury are the exclusive judges of the facts proved and of the weight to be given to the testimony," etc. (Code Crim. Proc., Art. 728.) And it is not for the court to ignore matters of fact submitted by a defendant, by refusing to submit to the jury the law applicable thereto. "Every theory of the case presented by the evidence, whether strongly or weakly supported thereby, demands instructions to

the jury directly and pertinently applied thereto, and this rule applies to every theory within the scope of the indictment which the evidence tends to establish, whether favorable to the State or the defendant." (Willson's Crim. Stats., Sec. 2338.)

When an indictment for felony charges the defendant as a principal offender under the code, he can not be convicted as an accomplice. (McKean v. The State, 7 Texas Ct. App., 631.) The distinction between these two different characters of offenders has been so often defined that it is only necessary to refer to such later decisions upon the subject as Smith v. The State, 21 Texas Ct. App., 108, Watson v. The State, Id., 598, Collins & Lindly v. The State, 24 Texas Ct. App., 142, and Blair v. The State, Id. 626.

Another refused instruction was that "the burden of proof never shifts from the State to the defendant, but is upon the State throughout." This proposition is elementary and has but few and rare exceptions. (Black v. The State, 1 Texas Ct. App., 368.)

Several other errors are complained of, but, inasmuch as they may not arise at another trial, we refrain from discussing them. Because of errors in the charge of the court, pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered October 24, 1888.