STANDARD OIL COMPANY *et al. v.* THE STATE.*

(*Nashville.* December Term, 1906.)

1. **STATUTORY CONSTRUCTION.** Intention to prevail over the literalism of the terms used, when.

The fundamental rule in the construction of statutes is that the real intention shall prevail over the literal terms used, for what is within the letter is not within the statute, unless it be the intention, and what is within the intention is within the statute, though not in the letter; and such construction ought to be put upon a statute as does not suffer it to be eluded or evaded. Several general rules quoted from cases and authorities. (*Post, pp.* 638-641, 643, 644.)

---

*As to illegal trusts under modern anti-trust laws, including constitutionality of laws, see note to Whitwell v. Continental Tobacco Co. (C. C. A. 8th C.), 64 L. R. A., 689.

9 Cates]                                                    ( 618 )

Standard Oil Co. v. State.

Cases cited and approved: State v. Turnpike Co., 2 Sneed, 89; Pond v. Trigg, 5 Heisk., 638; Perkins v. Gibbs, 1 Baxt., 175; Gold v. Fite, 2 Baxt., 248, 249; Brown v. Hamlett, 8 Lea, 735; Cooper v. Stockard, 16 Lea, 145; United States v. Railroad, 91 U. S., 72; Church v. United States, 143 U. S., 457; People v. Supervisors, 43 N. Y., 130.

2. **SAME.** Of State statutes to avoid conflict with constitution, State and federal, and acts of congress within its power.

State statutes should be construed so as not to conflict with the constitution of the State or the United States, or the acts of congress within its constitutional powers, if it can be done without violating the evident intention. (*Post, pp.* 641, 642.)

Case cited and approved: Commonwealth v. Gayne, 153 Mass., 205.

3. **SAME.** Anti-trust statute is constitutional; not regulation of interstate commerce; "importation" used for articles already imported.

The anti-trust statute (Acts 1903, ch. 140) is not violative of the constitution of the United States (art. 1, sec. 8), because it was not intended to apply to interstate commerce; and the word "importation" was inaccurately used in referring to articles already imported. (*Post, pp.* 642, 643, 644.)

Acts cited and construed: 1903, ch. 140, sec. 1.

Case cited and approved: Church v. United States, 143 U. S., 457.

4. **INTERSTATE COMMERCE.** Articles imported after becoming a part of the property here are subject to State legislation.

Articles of commerce imported from other States and countries, and commingled with the common mass of property in this State, are no longer articles of interstate commerce, and it is well settled that the commerce in such imported articles may be regulated by State legislation, and they are subject to the police power and revenue statutes of the State. (*Post, pp.* 643, 647, 648.)

Standard Oil Co. v. State.

Cases cited and approved: Steel & Wire Co. v. Speed, 110 Tenn., 546, 192 U. S., 500; Brown v. Houston, 114 U. S., 622; Coal Co. v. Bates, 156 U. S., 577.

5. **STATUTES.** Regulating intrastate commerce enforced, though containing clauses invalid as attempting to regulate interstate commerce, when.

Where the primary and chief purpose of a statute is to regulate and protect commerce within the State, and it is complete and capable of effective enforcement, it will be sustained and enforced so far as it relates to such commerce, though it contains clauses invalid as attempting to regulate interstate commerce. (*Post, pp.* 644, 645.)

Cases cited and approved: State v. Scott, 98 Tenn., 254; Austin v. State, 101 Tenn., 579; Kidd v. Pearson, 128 U. S., 1; Plumley v. Massachusetts, 155 U. S., 461.

6. **INDICTMENTS.** Charging conspiracy as to coal oil imported into this State refers to oil already imported and stored here, and not to oil to be imported, when.

An indictment charging that the defendants conspired, contracted, and agreed with a certain third person for the purpose and with a view to lessen and destroy full and free competition in the sale of a certain article of sale, coal oil, imported into this State, is a charge with reference to coal oil already imported and stored here, and not oil to be imported. (*Post, pp.* 645-647.)

7. **COMBINATIONS.** In violation of State statute are punishable, though incidentally affecting interstate commerce.

A combination affecting intrastate commerce is none the less a violation of the anti-trust statute of the State, and punishable under it, where the agreement made incidentally affects interstate commerce, as where defendant, for the purpose of protecting his own coal oil, stored here, from competition, agreed to give and did give another a quantity of oil on his countermanding an order given a competitor for oil to be shipped from another State. (*Post, p.* 647.)

Standard Oil Co. v. State.

8. **STATUTES.** Corporations are not included in the words "person or persons" in a statute showing a contrary intention, when.

Corporations are not indictable for the violation of the anti-trust statute (Acts 1903, ch. 140), because the words "person or persons" used in the indictment provisions thereof, when properly construed with the other provisions, for forfeiture of charters and licenses of corporations, do not include corporations. (*Post, pp.* 648-654.)

Code cited and construed: Sec. 62 (S.); sec. 48 (M. &. V.); sec. 50 (T. &. S. and 1858).

Acts cited and construed: 1903, ch. 140, secs. 1-4.

Cases cited: State v. University, 4 Humph., 156; Railroad v. State, 3 Head, 523; Publishing Co. v. State, 16 Lea, 176; State v. Brewing Co., 104 Tenn., 715.

9. **CODE.** Definitions apply to all subsequent statutes.

The Code definitions and provisions made applicable to the whole Code apply not only to the Code as originally enacted, but to all amendments thereof, which include all statutes passed since its enactment, in the absence of a contrary intention or purpose expressed in the statutes themselves. (*Post, p.* 650.)

Code cited and construed: Secs. 60-70 (S.); secs. 46-57 (M. & V.); secs. 48-59 (T. &. S. and 1858).

Cases cited and approved: Cowan v. Murch, 97 Tenn., 590; Wallace v. Goodlett, 104 Tenn., 672; Carroll v. Alsup, 107 Tenn., 257.

10. **COMBINATIONS.** Agent procuring contract for lessening full and free competition in trade is guilty of a violation of the anti-trust statute.

Where the agent of a corporation, acting upon directions to procure the countermand of orders given by its previous customers to a competitor for the purchase of coal oil, agreed to give and did give to one such customer, a merchant, one hundred gallons of oil to induce him to countermand his order,

Standard Oil Co. v. State.

which was done, and the oil delivered from the company's storage tank, such agent is guilty of a violation of the anti-trust statute (Acts 1903, ch. 140), because such agreement or combination was made with a view of lessening full and free competition in the sale of oil, and was in effect an agreement procured from said customer not to sell the oil of the competitor. (*Post, pp.* 654-662, 678, 679.)

Acts cited and construed: 1903, ch. 140, secs. 1 and 3.

Cases cited and approved: Bailey v. Plumbers, 103 Tenn., 99, 114; Hooker v. Vandewater, 4 Denio (N. Y.), 349; More v. Bennett, 140 Ill., 69; Nestor v. Brewing Co., 161 Pa., 473; Fuqua v. Brewing Co., 90 Tex., 298.

11. **SAME.** Same. Evidence of other like offenses is competent to show the intent, when.

The arrangements by which other orders secured by the competitor were countermanded are strong and convincing proof of the intent of the parties in making the one for which the defendant was indicted, and are competent and admissible for that purpose. (*Post, p.* 658.)

12. **CRIMINAL CONSPIRACY.** Acquittal of one prevents conviction of the other where only two were alleged to be members.

Where two persons are indicted for a criminal conspiracy, and no others are charged or alleged to be members of the conspiracy, and one of the defendants is acquitted, the other cannot be convicted, because then the preconcert of two or more necessary to constitute a conspiracy is not shown. (*Post, pp.* 662, 663.)

13. **SAME.** Indictment need not embrace all the conspirators.

An indictment for a criminal conspiracy may embrace only a part of the conspirators, and it is not necessary that all the parties to the conspiracy be indicted, though their names and the facts warranting their indictment appear in the averments. (*Post, p.* 667.)

Standard Oil Co. v. State.

14. **SAME.** Corporation and its officer or agent may both be guilty of criminal conspiracy, and both be counted as different parties to make the necessary number.

A corporation and its officer or agent engaging in a criminal or unlawful conspiracy must both be held to be parties to it, and must both be considered and counted in computing the necessary number of two or more to constitute a conspiracy. This is the rule not only settled by statute (Acts 1903, ch. 140, secs. 1 and 3), but independent of statute, and founded upon principle and existing in furtherance of sound public policy. (*Post, pp.* 663-670, 678, 679.)

Acts cited and construed:   1903, ch. 140, secs. 1 and 3.

Cases cited and approved:   People v. Duke, 19 Misc. Rep., 292, 44 N. Y. Supp., 336; Samuels v. Oliver, 130 Ill., 73.

15. **CORPORATIONS.** May commit wrongs, torts, and crimes, through officers and agents acting in apparent scope of their authority.

Corporations may commit wrongs, torts, and crimes, both of nonfeasance and in the discharge of their common duties, and of misfeasance in a violation of statutes and rules of the common law, through their officers and agents acting within the apparent scope of their authority and in the interest of their principal, the wrongful and criminal intent of the officer or agent being imputed to the corporation.   (*Post, pp.* 664-667.)

Cases cited and approved:   Railroad v. State, 3 Head, 523; Publishing Co. v. State, 16 Lea, 176; Railroad v. Quigley, 21 How. (U. S.), 204; Bank v. Bank, 10 Wall. (U. S.), 604; Bank v. Graham, 100 U. S., 699; Stewart v. Waterloo Turn Verein, 71 Iowa, 226; State v. Railroad, 15 W. Va., 362; Oil Co. v. Commonwealth (Ky.), 55 S. W., 8; Commonwealth v. Assn., 97 Ky., 325; Gillingham v. Railroad, 35 W. Va., 588; Smith v. Railroad, 48 W. Va., 69; W. Va., etc., Co. v. Oil Co., 50 W. Va., 611; Norris v. State, 25 Ohio St., 217; The Germania v. State, 7 Md., 1; Buffalo v. Oil Co., 106 N. Y., 669.

16. **SAME.** Chargeable as conspirator with its agent, acting under directions to do what constitutes a conspiracy, though the agent uses means not specifically authorized, when.

Where the special and chief agent and general manager of a corporation directed a subordinate agent and traveling salesman to procure the countermand of orders given by its previous customers to a competitor for the purchase of coal oil, and the salesman agreed to give and did give a quantity of oil to one of such customers in consideration of his countermanding an order .to the competitor for the purpose of preventing competition in preventing such customer's dealing in the oil of the competitor, the corporation is chargeable as a conspirator under the anti-trust statute (Acts 1903, ch. 140), though the traveling agent and salesman was not specifically authorized to give the oil away, the said chief agent being presumed to have been present and assenting, for and as representing the corporation, to the means used by its coconspirator, the subordinate agent and salesman, to carry out the conspiracy to restrict competition. (*Post, pp.* 670-674.)

Acts cited and construed:  1903, ch. 140.

Cases cited and approved:   Irvine v. State, 104 Tenn., 132-147; Spies v. People (Ill.), 12 N. E., 865, 3 Am. St. Rep., 320-482; United States v. Rindskopf, 6 Biss., 259; Phillips v. State (Tex. App.), 9 S. W., 557, 8 Am. St. Rep., 471.

17. **CRIMINAL CONSPIRACY.** Evidence of overt act not included in preconceived plans is competent, when.

Proof of an overt act is competent in cases like that stated in the last headnote, though the alleged preconceived plans did not necessarily include the commission of the act done, when such act is one which would tend, directly or indirectly, to accomplish the common purpose; and it is often convincing evidence of the existence of the combined intent and agreement. (*Post, pp.* 673, 674.)

Cases cited and approved:   State v. Ripley, 31 Me., 386; Martin v. State, 89 Ala., 115.

**18. EVIDENCE.** Withheld is presumed to be against the interest and insistence of the party so withholding it, when.

The presumption always is that competent and pertinent evidence within the knowledge and control of a party and withheld by him is against his interest and insistence. (*Post, p.* 672.)

Cases cited and approved:  Dunlap v. Haynes, 4 Heisk., 476; Kirby v. Tallmadge, 160 U. S., 379; Construction Co. v. B. W. Co., 36 C. C. A., 153.

**19. CRIMINAL CONSPIRACY.** Merchant countermanding order, for a gift, which tends to lessen and prevent competition is a party to the conspiracy, when.

Where an oil company agreed to give and did give a merchant a quantity of coal oil in consideration of his countermanding an order given a competitor for the purchase of oil for the purpose of preventing or lessening competition, the merchant was a party to the conspiracy within the meaning of the anti-trust statute (Acts 1903, ch. 140) prohibiting combinations and agreements tending to lessen competition in the sale of articles. (*Post, pp.* 663, 667, 674-678.)

Acts cited and construed:  1903, ch. 140.

Cases cited and approved:  Harbison v. Iron Co., 103 Tenn., 422; Dayton v. Barton, 103 Tenn., 604; State v. Buchanan, 5 Harris & J. (Md.), 517; Aikens v. Wisconsin, 195 U. S., 194.

FROM SUMNER.

Appeal in error from the Circuit Court of Sumner County.—B. D. BELL, Judge.

117 Tenn—40

JOHN J. VERTREES, WILLIAM O. VERTREES and JAMES W. BLACKMORE, for Oil Co.

ATTORNEY-GENERAL CATES, ROBERT L. PECK and W. A. GUILD, for State.

MR. JUSTICE SHIELDS delivered the opinion of the Court.

The Standard Oil Company, C. E. Holt, and O'Donnell Rutherford were indicted in the circuit court of Sumner county under chapter 140, p. 268, of the Acts of 1903, commonly known as the "Anti-Trust Law" of Tennessee, charged with making an unlawful contract and agreement with one S. W. Love, for the purpose and with a view to lessen full and free competition in the sale of coal oil, an article of sale imported into this State, and carrying out said contract in said county, in violation of the provisions of that act.

The Standard Oil Company and Holt, upon trial, were found guilty by the jury trying them, and a fine of $5,000 assessed against the former defendant, and $3,000 against the latter, upon which verdict judgment was entered. Rutherford was acquitted, upon the request of the district attorney representing the State. This case is before us upon an appeal, in the nature of a writ of error, prosecuted by the Standard Oil Company and Holt from the judgment against them.

The statute under which the indictment against the plaintiffs in error was preferred is as follows:

"Section 1.  Be it enacted by the general assembly of the State of Tennessee, and it is hereby enacted by the authority of the same, that from and after the passage of this act, all arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen full and free competition in the importation or sale of articles imported into this State, or in the manufacture or sale of articles of domestic growth or of domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are hereby declared to be against public policy, unlawful and void.

"Sec. 2. Be it further enacted, that any corporation chartered under the laws of the State, which shall violate any of the provisions of this act, shall thereby forfeit its charter and its franchise, and its corporate existence shall thereupon cease and determine.  Every foreign corporation which shall violate any of the provisions of this act is hereby denied the right to do, and is prohibited from doing, business in this State.  It is hereby made the duty of the attorney-general of the State to enforce these provisions by due process of law.

"Sec. 3.  Be it further enacted, that any violation of the provisions of this act shall be deemed, and is hereby

declared to be, destructive of full and free competition, and a conspiracy against trade, and any person or persons who may engage in any such conspiracy, or who shall, as principal, manager, director, or agent, or in any other capacity, knowingly carry out any of the stipulations, purposes, prices, rates or orders made in furtherance of such conspiracy, shall, upon conviction, be punished by a fine of not less than one hundred dollars or [nor] more than five thousand dollars, and by imprisonment in the penitentiary not less than one year nor more than ten years; or, in the judgment of the court, by either such fine or imprisonment.

"Sec. 4. Be it further enacted, that any person or persons or corporations that may be injured or damaged by any such arrangement, contract, agreement, trust, or combination described in section 1 of this act, may sue for and recover in any court of competent jurisdiction in this State of any person or persons or corporation operating such trusts or combination, the full consideration or sum paid by him or them of [for] any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust.

"Sec. 5. Be it further enacted, that it shall be the duty of the judge of the circuit and criminal courts of this State specially to instruct grand juries as to the provisions of this act.

"Sec. 6. Be it further enacted, that all laws and parts of laws in conflict with the provisions of this act be and the same are hereby repealed.

"Sec. 7. Be it further enacted, that this act take effect from and after its passage, the public welfare requiring it." Acts 1903, pp. 268, 269, c. 140.

The indictment contains two counts. The charging part of the first count is as follows:

"That the Standard Oil Company, a corporation, C. E. Holt and O'Donnell Rutherford, agents of the Standard Oil Company, unlawfully, knowingly, feloniously, wickedly, and maliciously conspired together, contracted and agreed with one S. W. Love, for the purpose and with a view of lessening and destroying full and free competition in the sale of a certain article of sale, imported into said State, to wit, coal oil, all to the evil example of all others in such case made and provided, and against the peace and dignity of the State."

The second count is more elaborate in its averments. They are in these words:

"That said Standard Oil Company, C. E. Holt and O'Donnell Rutherford, agents of the said Standard Oil Company, . . . knowingly, wickedly, and maliciously with a view to lessen and destroy full and free competition in the sale of a certain article of sale and imported into the State, to wit, coal oil, did unlawfully and knowingly conspire, contract, and agree with one S. W. Love, a customer of the Evansville Oil Company, that upon consideration of the said S. W. Love countermanding an order of ten barrels of coal oil theretofore given to the Evansville Oil Company, for which the said Love was to pay —— cents per gallon, to give him, the said Love,

one hundred gallons of oil; and the said Love, accepting said proposition, the said Holt, agent as aforesaid, knowingly carrying said stipulation and order, made in furtherance of said conspiracy, wrote a telegram addressed to the Evansville Oil Company, at Evansville, Indiana, countermanding the said order of ten barrels of oil, which he, the said Love, at the request of the said Holt, agent as aforesaid, sent to the said Evansville Oil Company, he, the said Holt, agent as aforesaid, paying for said telegraph message; and the said Holt, agent as aforesaid, knowingly carrying out said stipulation and order, made in said furtherance of said conspiracy by the said Standard Oil Company, delivered said one hundred gallons of coal oil to the said S. W.Love, thereby lessening competition in said article of sale as aforesaid, and so the grand jurors aforesaid, upon their oaths aforesaid, present and say that the Standard Oil Company, C. E. Holt and O'Donnell Rutherford, agents of the said Standard Oil Company, by means aforesaid, in the manner and form aforesaid, unlawfully, feloniously, willfully, wickedly, and maliciously conspired, controlled, stipulated, and agreed with the said S. W. Love for the purpose and with the view of lessening and destroying full and free competition in the sale of a certain article of sale imported into said State, to wit, coal oil, to the evil example. of all others in like cases offending, contrary to the statute, and against the peace and dignity of the State."

A motion to quash the indictment was made and over-

ruled. It is not necessary to here notice the grounds of this motion, further than to say that those going to the form of the indictment were properly overruled, and that those to the merits are involved in exceptions to the charge of the court, and the action of the trial judge in refusing certain special requests for instructions to the jury seasonably submitted by the plaintiffs in error, and in overruling the motion in arrest of judgment properly made; all of which will be passed upon in disposing of the assignments of error predicated upon this adverse action of the trial court.

The facts upon which the charge against the plaintiffs in error are based are these:

The Standard Oil Company is a corporation chartered under the laws of the commonwealth of Kentucky, and a subsidiary of the parent corporation of the same name, and deals in coal oil and other products of petroleum, refined and manufactured in Chicago, Ill., and perhaps other points out of this State.

The Evansville Oil Company is a foreign corporation or partnership, with its chief office in Evansville, Indiana, engaged in the same business, having its refinery and base of supplies at Oil City, Pa.

These two corporations or companies are competitors in business. The Evansville Oil Company, so far as disclosed by this record, confines its operations in Tennessee to interstate commerce; that is, it sells oil to be shipped from Oil City, Pennsylvania, and delivered here in the original packages. The Standard Oil Company is

engaged in intrastate commerce, and at the time of the occurrence of the transactions herein involved, had complied with the laws of Tennessee in reference to foreign corporations doing business in this State, and the revenue laws imposing a privilege tax upon all corporations and persons engaged in the sale of illuminating oils and lubricants. In conducting this business, it established agencies at the principal towns in the State, where it keeps stored a stock of coal oil to supply the local trade. The oil is brought to these agencies by railroad transportation in large iron tanks, called "tank cars," from which it is drawn and stored in other large iron tanks there located, called "storage tanks;" from the storage tanks it is drawn, when sold, into iron tanks mounted on wagons, called "tank wagons," and delivered to retail merchants, customers of the company. It had, for some years previous to October 5, 1903, maintained such an agency, storage tanks, and tank wagons at Gallatin, Tennessee, and at the time had a large quantity of oil, imported from other States, there stored and for sale. This business was conducted through a number of agents superior and subordinate, styled "special agents," "salesmen" and "local agents." J. E. Comèr was special agent, with his office at Nashville, Tennessee, and as a general manager of the business of the company in his district, which included Middle Tennessee, East Tennessee, and portions of the adjoining States of Kentucky, Alabama, and Georgia. He controlled all other agents in his territory, fixed prices, and generally di-

rected the marketing of the products of the company and the policy to be pursued by it.

The plaintiff in error C. E. Holt was a salesman, and, under J. E. Comer, superintended and had control of the local agents and the business in their charge. He visited the agencies frequently, checked up the accounts of the agents, saw the customers of the company, sold oil, arranged wagon routes, and did other things deemed necessary to advance the interests of his employer.

O'Donnell Rutherford was the local agent stationed at Gallatin. His duties were to care for the property of the company in his hands, to sell and deliver oil to the merchants within his territory, and collect and account for the proceeds. C. E. Holt and O'Donnell Rutherford were required to make written reports to J. E. Comer, those of Holt to be made daily, and those of Rutherford semiweekly. They sold oil at prices fixed by Comer, and had no general authority to give oil away for any purpose.

The Standard Oil Company had no competitor in its business at Gallatin at this time. The oil which it had stored and for sale there was of an inferior quality, and the price for which it sold it, $13\frac{1}{2}$ cents per gallon, was in excess of its value, and more than it was sold for by it at other points, where competition existed.

Among its customers there were S. W. Love, a Mr. Cron, a Mr. Hunter, and a Mr. Lane. It also had some other customers there and in the adjacent country.

Thus matters stood when on October 5, 1903, Claude

Rosemon, a salesman of the Evansville Oil Company visited Gallatin, and procured orders from S. W. Love and other customers of the Standard Oil Company for a carload of oil, about sixty barrels, of a quality superior to that sold by the defendant company at 14½ cents per gallon, to be shipped from Oil Cty, Pennsylvania, and delivered in the original packages, about November 1, 1903. Ten barrels were sold to S. W. Love upon these terms.

Within a few days thereafter, J. E. Comer, learning that Rosemon had been in Gallatin, and probably made some sales of oil there, wrote to C. E. Holt and directed him to go to Gallatin and hold his trade, and procure the orders that had been given to the Evansville Oil Company countermanded.

Holt went to Gallatin, as directed, without delay, called upon S. W. Love, and made an arrangement with him, by the terms of which he agreed to and did countermand the order he had given to the Evansville Oil Company, in consideration of the gift of one hundered gallons of oil, to be delivered from the storage tanks of the Standard Oil Company at Gallatin.

The countermand was made in the form of a telegram to the Evansville Oil Company, signed by Love and sent at the expense of Holt.

Similar arrangements were made with several other persons in Gallatin who had ordered oil from the Evansville Oil Company, which resulted in the countermanding of about one-half of the orders procured by Rose-

mon, and the delivery to the merchants who had made them of three hundred gallons of oil, free of charge, by the local agent, Rutherford, in the usual manner, from the storage tank of the Standard Oil Company.. Holt also attempted to make the same arrangements with other merchants to whom Rosemon had sold oil.

When these orders had been countermanded, J. E. Comer informed the comptroller of the State that a shipment of oil would be made to Gallatin by the Evansville Oil Company, presumably for the purpose that he might direct the clerk of the county court of Sumner county to collect the privilege tax from that company, for which it would be liable in case it sold oil from storage at Gallatin, but for which it was not liable for the sales originally made, as they were interstate commerce. C. E. Holt also informed the clerk of the county court of Sumner county that the oil would be shipped to Gallatin in a few days, with a request to look out for it and collect the privilege tax from the Evansville Oil Company, if sales were made.

When the oil sold by the Evansville Oil Company arrived at Gallatin (for it seems to have been shipped before the orders were countermanded), S. W. Love and others, who had countermanded their orders under the arrangement negotiated by Holt, refused to receive that purchased by them. The company was compelled to store its oil there and sell it to new customers, and in this way it incurred considerable expense, in addition to the privilege tax upon oil dealers which it was compelled

to pay to the State and the county on account of such sales. While the oil refused was sold at the same price it had originally been contracted for, 14½ cents per gallon, yet the Evansville Oil Company was the loser by the transaction, by reason of the extraordinary expense incurred, not provided for in fixing the price in the original sales, and was forced to abandon further efforts to sell oil at that point. After this, defendant oil company advanced the price upon its oil to 14½ cents per gallon.

These transactions became public, and about December 22d or 23d were published in the newspapers of Gallatin and Nashville, and an agent of the Evansville Oil Company called upon and had an interview with J. E. Comer upon the subject, when the latter denied responsibility for the action of Holt in giving the oil away, and repudiated it. Thus far there is practically no controversy about the facts. We will state some others which the plaintiffs in error insist are proven.

C. E. Holt testifies that, while he was directed by J. E. Comer to procure the orders to be countermanded, he was not authorized to give oil away for that purpose, and that his action in this particular was upon his own account; that, while he directed Rutherford to deliver the oil without charge, he promised to pay for it himself, and showed Rutherford how to conceal its delivery in his report to Comer until he should do so; that his salary was $65 per month, and that the oil which he gave away amounted to $40.50, and that he has not paid any one for it.

J. E. Comer testifies that when he learned of the gift of the oil he had Rutherford called up over the telephone, and demanded an explanation of the matter; that Rutherford came to Nashville that evening, bringing with him a copy of a Gallatin paper containing an article upon the subject, and for the first time told him that the oil had been given away; and that on the same day he wrote to C. E. Holt condemning the gift of the oil. J. E. Comer, C. E. Holt, and O'Donnell Rutherford all testify that the oil was given away without the authority of Comer, and was concealed from him until disclosed by Rutherford to him, in his office at Nashville, and that Rutherford was charged with the value of the oil. It does not appear that any attempt was made to recover the oil, or its value, from the customers of the company to whom it had been given, as claimed, without authority, by Holt and Rutherford. A copy of the letter which Comer wrote to Holt condemning the gift of the oil is produced in evidence by the defendants, but neither the originals nor copies of the letter which Comer wrote to Holt instructing him to go to Gallatin and have the orders secured by Rosemon countermanded. The daily reports of Holt and the semiweekly reports to Comer were not produced, although it was admitted by Comer that they were on file and a part of the records at his office in Nashville, a short distance from and in easy communication with Gallatin, where the trial was held.

There are other facts bearing upon the transaction which will hereafter be stated.

The several contentions upon which the plaintiffs in error rely for a reversal of the judgment against them will now be disposed of in the logical order in which we conceive they arise.

First. The plaintiffs in error assail the constitutionality of the statute on which the indictment against them is predicated. Their contention is that it applies to contracts, agreements, arrangements, trusts, and combinations made in relation to the importation of articles of commerce from other States into this State, is a regulation of interstate commerce, and therefore, to that extent, it violates that portion of article 1, section 8, of the constitution of the United States which vests in congress the power to regulate commerce with foreign nations, among the several States, and with the Indian tribes, and is void.

It is not insisted that it applies solely to interstate commerce, but to that equally with commerce with the State, and that the arrangement which the plaintiffs in error are alleged to have made was one relating to property to be thereafter imported into the State.

We cannot agree to this insistence. The statute, when properly construed, does not apply to interstate commerce. The sole object and purpose of the enactment of it was to correct and prohibit abuses of trade within the State. This was the legislative intent, and will prevail over the literal meaning of words or terms found in the act.

"The fundamental rule," says Judge Cooper, speaking

for this court in the case of *Brown* v. *Hamlett,* 8 Lea, 735, "of construction of all instruments is that the intention shall prevail, and for this purpose the whole of the instrument will be looked to.   The real intention will always prevail over the literal use of terms.   Legislative acts fall within the rule, and it has been well said that a thing which is within the letter of a statute is not within the statute unless it be within the intention of the lawmakers."

And in *Gold* v. *Fite,* 2 Bax., 248, 249, it is said: "A thing which is within the intention of the makers of a statute is as much within the statute as if it were within the letter.   And a thing which is within the letter of the statute is not within the statute unless it be within the intention of the makers, and such construction ought to be put upon it as does not suffer it to be elevated" [evaded or eluded].

Other cases in accord are: *State* v. *Turnpike Co.,* 2 Sneed, 89; *Pond* v. *Trigg,* 5 Heisk., 638; *Perkins* v. *Gibbs,* 1 Bax., 175; *Cooper* v. *Stockard,* 16 Lea, 145; *Rector of Holy Trinity Church* v. *United States,* 143 U. S., 457, 12 Sup. Ct., 511, 36 L. Ed., 226.

It has also been held that:

"The occasion of the enactment of a law may always be referred to in interpreting and giving effect to it.   The court should place itself in the situation of the legislature, ascertain the necessity and probable object of the statute, and then give such construction to the language used as to carry the intention of the legislature into ef-

fect, so far as it can be ascertained from the terms of the statute itself." *People* v. *Supervisors of Columbia County*, 43 N. Y., 130.

And that:

"Courts in construing a statute may, with propriety, recur to the history of the times when it was passed, and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions in it." *United States* v. *Union Pacific Railway*, 91 U. S., 72, 23 L. Ed., 224.

Mr. Black in his valuable work on Interpretation of Laws (page 213), after citing the cases last quoted from, says: "Hence, whenever light can be derived from such sources, courts will take judicial notice of the facts of contemporary history, the prior state of law, the particular abuse or defect which the act was meant to remedy, and the application to such state of affairs of the language which it employs. They will also, for this purpose, inform themselves of such facts and circumstances by any and all available means."

It is further said by the same author (page 233) that "In order, therefore, to form a correct estimate of its [a statute's] scope and effect, it is necessary to have a thorough understanding of the laws, both common and statutory, which heretofore were applicable to the same subject. Whether the statute affirms the rule of the common law on the same point, or whether it supplements it, supersedes it, or displaces it, the legislative enactment must be construed with reference to the common

law, for in this way alone is it possible to reach a just appreciation of its purposes and effect."

We are also, in arriving at the intention of the legislature enacting a statute, to consider the acts of congress upon the same kindred subjects, as we would those of our general assembly. The acts of congress, when within the scope of powers delegated by the states to the federal government, are the statute law and the higher statute law of the several States, and are enforced by their courts, in matters of which they have jurisdiction, as fully as their own statutes, without being specially plead or proven.

In the case of *Commonwealth* v. *Gayne,* it is said:

"Where two governments like those of the United States and the commonwealth exercise their authority within the same territory and over the same citizens, the legislature of that which as to certain subjects is subordinate should be construed with reference to the powers and authority of the superior government, and not be deemed as invading that unless such construction is absolutely demanded." *Commonwealth* v. *Gayne,* 153 Mass., 205, 26 N. E., 449, 10 L. R. A., 442.

It is also a familiar canon of construction of statutes that they must be so construed, if it can be done without violence to the evident intent of the legislature, so as to avoid any conflict with the constitution of the State or of the United States; and that every intendment, when the statute has been formally enacted, must be made in

117 Tenn—41

favor of its validity, and that, where it is subject to two constructions, that must be given which will sustain it, rather than that which will defeat it.

The legislature was cognizant, we must presume, that it had no power to enact laws regulating interstate commerce, and did not intend to enact an unconstitutional law, in whole or in part. There was already then in force an act of congress, the Sherman anti-trust act, enacted in 1890, fully covering that subject, the provisions of which were much broader and more effective than those of this act, and could be enforced to their fullest extent by the stronger and more vigorous government. There was neither the power nor the necessity for enacting any legislation relative to interstate commerce. The wrongs to trade which were intended to be corrected and punished were those being perpetrated against commerce within the State, which congress could not reach, and for which there was then no efficient remedy. The only statute then in force in Tennessee relative to these abuses was one making it an ordinary misdemeanor for two or more persons to conspire to commit any act injurious to public morals, trade, or commerce (Code [Shannon's Ed.], sec. 6693), and that there was a necessity for a more drastic one was a matter of common knowledge and generally recognized, and the enactment of this statute was an attempt to supply it.

We give no force to the word, "importation," appearing in section 1, because we think it was inaccurately used in referring to articles already imported; that is,

that the phrase "importation or sale of articles imported into this State" was intended to include and describe, among the articles of commerce to be protected, those which had been imported from other States and countries, commingled with the common mass of property in this State, and no longer articles of interstate commerce. It is well settled that commerce in such imported articles may be regulated by State legislation. *American Steel Wire Co.* v. *Speed*, 110 Tenn., 546, 75 S. W., 1037, 100 Am. St. Rep., 814; S. C., 192 U. S., 500-519, 24 Sup. Ct., 365, 48 L. Ed., 538. It is certain that merchandise of this character was intended to be included within the provisions of this act, otherwise commerce, in the vast amount of valuable property of foreign production and manufacture that was then and is now in this State, would be wholly unprotected from the abuses legislated against. In no other way is such property mentioned, included, or referred to in the statute, and this phrase must be held to apply to it. A large part of the wealth of the people of the State is invested in imported property, and it cannot be presumed that the legislature intended to discriminate against it. It needed the same protection as that of domestic growth or manufacture. The legislature clearly intended to prohibit trusts, combinations, and agreements affecting all commerce not covered by the federal statute, and upon which it had a right to legislate. It did not intend to stop short of its power or to exceed it.

The case of *Rector of Holy Trinity Church* v. *United*

*States,* supra, is much in point here. There it is said:

"It is a familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. This is not substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act."

And again: "The construction invoked cannot be accepted as correct. It is a case where there was presented a definite evil, in view of which the legislature used general terms with the purpose of reaching all phases of that evil, and therefore, unexpectedly, it is developed that the general language thus employed is broad enough to reach cases and acts which the whole history and life of the country affirm could not have been intentionally legislated against. It is the duty of the courts, under those circumstances, to say that, however broad the language of the statute may be, the act, although within the letter, is not within the intention of the legislature, and therefore cannot be within the statute."

But if the act did prohibit the abuses legislated

against in the importation of articles in this State, such provision does not vitiate the entire statute; it is constitutional and valid, so far as it affects commerce in articles which have been imported into the State and become commingled with the common mass of property of the State and subject to its laws, as articles of domestic production and manufacture.

It is evident, from what we have already said, that the prevention of unlawful contracts in relation to the importation of articles was not the inducement of the enactment of this statute, but that the primary and chief purpose of the legislature, beyond all question, was to protect commerce within the State. Its provisions upon this subject are to no extent and in no manner dependent upon one protecting the importation of merchandise from other States and countries. They are complete, and capable of effective enforcement, without one in relation to interstate commerce. Such statutes, notwithstanding they contain clauses regulating interstate commerce, a matter not within the power of the States, have frequently been sustained and enforced by this court and the supreme court of the United States, so far as they relate to commerce within the State. *State* v. *Scott*, 98 Tenn., 254, 39 S. W., 1, 36 L. R. A., 461; *Austin* v. *State*, 101 Tenn., 579, 48 S. W., 305, 50 L. R. A., 478, 70 Am. St. Rep., 703; *Kidd* v. *Pearson*, 128 U. S., 1, 9 Sup. Ct., 6, 32 L. Ed., 346; *Plumley* v. *Massachusetts*, 155 U. S., 461, 15 Sup. Ct., 154, 39 L. Ed., 223.

The plaintiffs in error are also mistaken in their con-

ception of the charge made in the indictment, and of
the object and effect of the evidence introduced to prove
it. The express averments of both counts of the indict-
ment are that the defendants therein named conspired,
contracted, and agreed with S. W. Love for the purpose
and with a view to lessen and destroy full and free com-
petition in the sale of a certain article of sale, coal oil,
imported into this State; and the proof introduced by
the State upon the trial was for the purpose of proving
an agreement to lessen and destroy competition in the
sale of coal oil which had, previous to the agreement,
been imported into the State, and was then stored and
upon sale at Gallatin. There is no averment that the
agreement was made with a view to lessen, or intended
to lessen and destroy, competition in the sale of coal
oil to be imported by the Evansville Oil Company, and
no proof was offered to that effect.

The charge upon which the plaintiffs in error were
indicted, tried, and convicted is the alleged making of
an unlawful contract and agreement with S. W. Love to
lessen and destroy competition in the sale of coal oil
which the Standard Oil Company had imported into this
State and had, at the time of the agreement, stored in
its storage tanks at Gallatin, and there offered for sale.
The charge is that the agreement was made to protect
oil already imported, and not oil to be imported. The
evidence offered tended to prove an agreement con-
ceived and effected by the Standard Oil Company and its
agents to protect the oil of the principal then stored in

Gallatin, from competition with that about to be imported and offered for sale by a competitor, and not to protect that of the Evansville Oil Company yet to be transported there.

A combination affecting interstate commerce is none the less a violation of the federal anti-trust statute and punishable under it, where the agreement made incidentally affects intrastate commerce; and the same rule will apply to combinations made in violation of the statute of the State upon the same subject, where interstate commerce is incidentally affected. If it were otherwise, neither the federal nor the State laws could be enforced in any case.

The importation of oil to be made by the Evansville Oil Company was only the occasion, the incentive, of the conspiracy charged in relation to that theretofore imported by the Standard Oil Company.

It is true the oil of the Standard Oil Company had been an article of interstate commerce, but it was not when the agreement with S. W. Love was made. It was then at rest in this State, and was subject to its revenue laws and the police power of the State. That it was subject to the revenue laws is conceded by the Standard Oil Company, and it had taken out a license and paid the revenue required and imposed by the laws of the State. That it was in its then condition subject to the police power of the State cannot be doubted. *Am. Steel & Wire Co.* v. *Speed,* 110 Tenn., 546, 75 S. W., 1037, 100 Am. St. Rep., 814; S. C., 192 U. S., 500-519, 24 Sup.

Ct., 365, 48 L. Ed., 538; *Brown* v. *Houston,* 114 U. S., 622, 5 Sup. Ct., 1091, 29 L. Ed., 257; *Pittsburg, etc., Co.* v. *Bates,* 156 U. S., 577, 15 Sup. Ct., 415, 39 L. Ed., 538.

Second. The Standard Oil Company insists that the statute in question, if constitutional and valid, does not authorize an indictment against a corporation guilty of violating its provisions; that punishment by indictment, fine, and imprisonment, as provided in section 3 of the act, is confined to natural persons; and that the punishment for corporations is provided for in sections 2 and 4, that is, forfeiture of charter and franchises of corporations created under the laws of Tennessee, and denial of the right to do business in this State to foreign corporations, and liability of both classes of corporations to pay and refund the full consideration paid them for any goods, wares, merchandise, or other articles, the sale of which is controlled by an unlawful combination or trust.

If this contention is sound, the judgment against the Standard Oil Company must be reversed, regardless of whether it participated in, authorized, or ratified the contract or agreement made by Holt with S. W. Love. We again call attention to the provisions of the statute:

Section 1 forbids as against public policy, and declares unlawful and void, all arrangements, contracts, agreements, trusts, or combinations between "persons or corporations," made with a view to lessen, or which tend to lessen, full and free competition in the articles

of sale mentioned, or which are designed or tend to advance, reduce, or control the price or cost to the purchaser or consumer of such articles.

Section 2 provides that any "corporation" of this State which violates the provisions of the act shall forfeit its charter and franchises, and that any "foreign corporation" guilty shall be denied the right to do business in this State, and it is made the duty of the attorney-general of the State to enforce these provisions by due process of law.

Section 3 provides that any violation of this act shall be deemed and is declared to be destructive of full and free competition, and a conspiracy against trade, and that any "person or persons" who may engage in such conspiracy, or who shall, as "principal," "manager," director or "agent," or in any other capacity, do any act in furtherance of such conspiracy—that is, any act carrying out and executing the prohibited arrangement, trust, or combination—shall upon conviction, be punished by fine of not less than $100 nor more than $5,000, and by "imprisonment" in the penitentiary for not less than one year or more than ten years, or, in the judgment of the court, by either such fine or imprisonment.

Section 4 enacts that any person or persons or corporations that may be injured or damaged by any violation of section 1 may sue for and recover, in any court of competent jurisdiction, of the person or persons or corporation operating such trusts or combination, the full consideration or sum paid by him or them for the prop-

erty, the sale of which is controlled by such combination or trust.

It appears that in section 1 persons and corporations are both mentioned, that in section 2 corporations only are mentioned, that in section 3 persons only are mentioned, while in section 4 persons and corporations are again both mentioned.

The question, then, is whether the word "person" is used in this statute to include both natural persons and artificial persons, or corporations.

It is conceded, as it must be, that the word "person" in a statute may and oftentimes does include corporations. We think this must be held to be so, under section 62 of Shannon's Code, declaring that the word "person" includes a corporation. The general provisions of chapter 2 of the Code, where this section is found, there declared to be applicable to the whole Code, apply not only to the Code as originally enacted, but to all amendments thereof, which include all statutes passed since its enactment, in the absence of a contrary purpose expressed in the statutes themselves. *Cowan* v. *Murch,* 97 Tenn., 590, 37 S. W., 393, 34 L. R. A., 538; *Wallace* v. *Goodlett,* 104 Tenn., 672, 58 S. W., 343; *Carroll* v. *Alsup,* 107 Tenn., 257, 64 S. W., 193.

That the word "person" includes corporations has also been in effect held in numerous cases decided by this court, both before and since the adoption of the Code. *State* v. *Nashville University,* 4 Humph., 156; *Railroad* v. *State,* 3 Head, 523, 75 Am. Dec., 778; *Banner Pub. Co.*

v. *State,* 16 Lea, 176, 57 Am. Rep., 216; *State* v. *Schlitz Brewing Co.,* 104 Tenn., 715, 59 S. W., 1033, 78 Am. St. Rep., 941.

While this is true, it does not always include corporations, and in the construction of a statute involving the question whether it does or not, it must always be determined by ascertaining the legislative intention, to be found by the aid of the context and the general scope and purpose of the act. It is said by Mr. Black:

"The word 'person' is a general or generic term; hence, when embraced in a statute, it embraces not only natural persons, but also artificial persons, such as private corporations, unless the context indicates that it was used in a more limited sense, or the subject-matter of the act leads to a different conclusion; that is to say, it applies to corporations in all instances where it can reasonably or logically so apply. For example, a statute providing that if any person shall convey real estate . . . and shall not at the time have legal title to such lands, but shall afterwards acquire the same, the legal or equitable title afterwards applied shall immediately pass to the grantee, applies as well to individuals as to corporations. So, also, a statute giving a right of action for damage against any 'person' whose wrongful act, neglect, or default shall cause the death of a human being, applies equally to corporations as to private individuals. But still there are many cases in which the legislature does not mean that the word 'person' shall include corporations. This is always a question of intention, and ·

the intention must be sought for and determined in each case by the aid of the context, the general scope and purpose of the act, and other pertinent considerations." Black on Interpretation of Laws, p. 138.

Considering this statute as a whole, we do not think it was the intention of the legislature that the word "persons," as used in it, should include corporations. We think this conclusion is irresistible from the uses of both terms "persons and corporations" in some sections of the statute, and that of only one in other sections, when taken in connection with the subject-matter of the several sections.

In the first section of the act, where in the unlawful contracts, arrangements, and combination intended to and which tend to lessen competition, or which are designed or tend to advance, reduce, and control prices, are prohibited, both persons and corporations are expressly mentioned, and it is manifest that here the word "person" was only meant to include natural persons, otherwise it would have been unnecessary to mention corporations. This same use of the two words "persons" and "corporations," in order to designate natural persons and artificial persons, is also made in section 4 of the act. It is clear that both of these sections apply to both persons and corporations, because both are in terms mentioned. Contrast with these sections 2 and 3. The word "corporation" only is used in section 2, and unquestionably only corporations were meant, because persons were not included in the term "corporation," and

have no charters to forfeit. In section 3 only the words "person or persons" are used. The punishment here provided for those who may engage in such conspiracy, or who, as principal, manager, director, or agent, knowingly violate the statute, is by fine and imprisonment, part of which, imprisonment, can only be inflicted upon natural persons, because it is impossible to imprison corporations.

Another distinction between section 2, providing for the punishment of corporations, and of section 3, providing for the punishment of natural persons, is that in the former it is made the duty of the attorney-general of the State to enforce such punishment, while in the latter section there is no such provision, since it is the duty, under the general law, of the district attorneys of the several circuits of the State to prosecute all crimes and misdemeanors.

Sections 1 and 4 of the act in their nature can be applied with equal force and facility to both natural and artificial persons, and they are in terms made to apply to persons and corporations. The provisions of section 2 can only apply to corporations, and there only are corporations mentioned. Section 3 was evidently intended to apply to natural persons only, since persons only are mentioned in it, and can hold the positions therein mentioned, such as manager, director, or agent, and part of the punishment provided for, imprisonment, can only be possible for natural persons.

Another distinction between sections 2 and 3 is that

in the former foreign corporations guilty of violating the act are prohibited from thereafter doing business in Tennessee, while no such inhibition against "persons" who are guilty is contained in the latter section.

The punishment prescribed in section 3, however, is indirectly effective against corporations, because they can only act through agents; and, if their officers and agents are deterred by severe personal punishment from violating the act, it necessarily prohibits the corporations from transgressing.

We are therefore of the opinion that section 3 of the statute was not intended to and does not apply to corporations, and that the corporations cannot be indicted and fined under it, and for this reason the motion to quash the indictment upon this ground made by the Standard Oil Company in its own behalf should have been sustained.

Third. The case remains to be considered as against plaintiff in error Holt. The first ground upon which it is insisted that the judgment must be reversed as to him is that the facts proven do not make out a conspiracy under the statute.

The statute prohibits all arrangements, contracts, agreements, combinations, or trusts made with a view to lessen, or which tend to lessen, full and free competition in the sale of merchandise, imported or domestic, manufactured or raw material, or which are designed or tend to advance the cost of such merchandise to the consumers; and provides that all persons who engage in

such contracts or combinations, or who may, as principal, manager, director, or agent, or in any other capacity, knowingly carry out any of the stipulations, purposes, prices, rates, or orders made in furtherance of such conspiracy, are subject to indictment, and, on conviction, to the punishment therein prescribed.

Was the contract and arrangement, which was effected and carried out with S. W. Love, one of the character here denounced?

We will again briefly refer to the facts. The Standard Oil Company and the Evansville Oil Company were both engaged in the sale of refined coal oil in Tennessee, and were competitors in business. The Evansville Oil Company confined its operations in this State to interstate commerce. The Standard Oil Company was engaged in commerce wthin the State as an oil dealer. J. E. Comer was its general manager and controlled its affairs, and dictated its policy in this territory; and C. E. Holt and O'Donnell Rutherford were subordinate agents under him and subject to his orders. Their authority and duties have been stated.

This company held oil stored at Gallatin for sale and delivery to the merchants there, which it was then selling at 13½ cents a gallon, a price in excess of its market value at other places, it being an inferior quality of illuminating oil. S. W. Love was a merchant at Gallatin, and dealt in illuminating oils.

The Evansville Oil Company sold about sixty barrels of oil to merchants in Gallatin, former customers of the

Standard Oil Company, selling S. W. Love ten barrels, to be delivered about November 1, 1903. It was a better oil than that sold by the Standard Oil Company at that place, and it was sold for the price of 14½ cents per gallon. These were the first sales that this company had made at that point.

When J. E. Comer was informed of this invasion of the territory in which his employer had theretofore had an undisputed monopoly, he wrote to C. E. Holt, then on the road in the discharge of his duties, to go imme· diately to Gallatin, and hold his trade, and procure a countermand of the orders which had been given to the Evansville Oil Company. The substance of the instructions given Holt, and the object of his visit to Gallatin, was to make arrangements to have the orders for oil given by merchants there to the Evansville Oil Company countermanded, and thus prevent their oils from being brought into competition with those of the Standard Oil Company, then on sale at that place.

This is the purport and effect of the testimony of both Comer and Holt, although they differ in the exact language used, which would have appeared had the letter from Comer to Holt containing the instructions given the latter been produced. It is what Holt did, so far as it was possible for him to do, when he arrived at Gallatin. The means which he used to effect the arrangements he made with S. W. Love, the one involved in this case, was the gift of one hundred gallons of coal oil, to be delivered and actually delivered, from the storage

tanks of the Standard Oil Company. When the oil which Love had ordered from the Evansville Oil Company arrived, he refused to receive it, and it, with that sold to other merchants who had been induced to countermand their orders, had to be stored and sold to other customers at a ruinous expense to the Evansville Oil Company, and that company abandoned all further effort to sell oil in that market.

There is no doubt upon these facts that an agreement was negotiated by Holt with Love by the terms of which the latter agreed to countermand his order to the Evansville Oil Company, and not sell the oil of that company in Gallatin.

We think it equally free from doubt that this agreement was made with a view of lessening full and free competition in the sale of coal oil, which the Standard Oil Company was then offering for sale at Gallatin. There was no other purpose for making it or giving away oil to effect it. It was not made in legitimate commerce. It was not a sale or an offer to sell oil. In effect, the agreement was one by Love for a valuable consideration, paltry, it is true, not to sell the oil of the Evansville Oil Company in Gallatin in competition with that of the Standard Oil Company. To this extent he surrendered his liberty of action, and destroyed his right of freedom of contract. Neither the countermand of the order given to the Evansville Oil Company, nor the gift of oil by the Standard Oil Company or its agents, was in itself

117 Tenn—42

criminal; but the agreement made to countermand the order, for the purpose of destroying or lessening competition in the sale of coal oil in Gallatin, is in contravention of the plain provisions of the statute, and is a crime. The arrangement made necessarily tended to lessen competition.

The inevitable result of selling other and better oil in that community was to create competition, and the prevention of such sale lessened and averted it entirely. That competition was thereby lessened is conclusive on this point.

The arrangements by which other orders secured by the agent of the Evansville Oil Company were countermanded are strong and convincing proof of the intent of the parties in making this one with Love, and were competent and admitted for that purpose. Further evidence of the intention of Comer and Holt in making the arrangements for their employer is to be found in the fact that as soon as they had succeeded in having orders for about one-half of the carload of oil which the Evansville Oil Company had sold countermanded, with knowledge that this oil would have to be stored and sold at Gallatin, or to other customers, or reshipped at an expense far beyond the profits of the venture, they notified the authorities, whose duty it was to collect the tax from dealers, that the property would be there and possibly offered for sale, so as to, by this means, increase the expense of the competitor of their employer, and further

embarrass it in its attempt to compete in the sale of oil at Gallatin.

These facts are all involved in the verdict of guilty against Holt, and, as the evidence does not preponderate against the finding of the jury, they must be considered as established for the purposes of the case.

The making of the agreement with Love, with a view to lessen competition, and which tended to do so, is thus fully proven. This is all that is necessary to constitute a violation of the statute. The statute was not only intended to prohibit contracts and combination between those engaged in the same business, made for the purpose, or which had a tendency, to destroy all competition, and which are injurious to the whole public, but those made and formed by any and all persons with a view, or which in their nature tend, to lessen competition to any material extent, to the injury of any part of the people of the State. The number of persons, generally speaking, engaged in the conspiracy, the extent of the territory affected, the degree which it was intended or has a tendency to lessen competition, the extent of the injury to the public, or whether it be permanent or temporary in its character, are not material elements of the offense. The form of the combination is also a matter of indifference. No forms or precedents are followed in the commission of crime. In any form the agreement may be made, or disguise in which it may appear, or whatever scheme may be adopted to accomplish the prohibited acts, it is within the statute. It is enough that

the contract was made with a view to lessen competition in the sale of an article of commerce of prime necessity, and that it is injurious to the public, however limited and restricted it may be in its scope, effect, duration. It is its purpose, tendency, and effect that makes it unlawful.

Contracts of the character made by these parties were unlawful under the common law, and those engaged in them subject to indictment.

This court, construing a statute containing the same provisions of the one here applied, through Mr. Justice Caldwell, said:

"Courts are practically unanimous in holding that contracts, agreements, arrangements, or combinations, in whatever form or name, are contrary to public policy and void, when they tend to impair competition in trade and to enhance prices to the injury of the public. . . . It is not the number of persons participating in the by-law [the illegal agreement in that case], or the extent of the territory included, but the injury to the public in that territory, however restricted, that characterizes the interruption of trade as illegal." *Bailey* v. *Master Plumbers,* 103 Tenn., 99, 106, 114, 52 S. W., 853, 46 L. R. A., 561.

In *Hooker* v. *Vandewater,* 4 Denio (N. Y.), 349, 47 Am. Dec., 258, it is said:

"All the courts, ancient and modern, agree that a combination, the tendency of which is to control prices, is detrimental to the public and consequently unlawful.

"A combination, the tendency of which is to prevent competition in its broad and general sense, and to control, and thus at will enhance prices, to the detriment of the public, is a monopoly, nor need it be permanent and complete. It is enough that it may be temporary and partially successful. The question is, does it inevitably tend to public injury?"

In *More* v. *Bennett,* 140 Ill., 69, 29 N. E., 888, 15 L. R. A., 361, 33 Am. St. Rep., 216, we read:

"True, the restraint is not far reaching as it would have been if all the stenographers of the city had joined the association, but, as far as it goes, it is of precisely the same character, produces the same results, and is subject to the same legal objection."

And in *Nester* v. *Continental Brewing Company,* 161 Pa., 473, 29 Atl., 102, 24 L. R. A., 247, 41 Am. St. Rep., 894, the court, in holding the agreement involved to be unlawful, said:

"The test question in any case like the present is whether or not a contract in restraint of trade exists which is injurious to the public; if injurious, it is void as against public policy. Courts will not stop to inquire as to the degree of an injury inflicted; it is enough to know that the natural tendency of such contracts is injurious. So it is obviously immaterial whether the restraint be general or partial. The application of the rule does not depend upon the number of those who may be implicated, or the extent of the space included in

the combination, but upon the existence of injury to the public."

The arrangement made in this case is in many respects like that involved in *Fuqua, Hinkel & Davis* v. *Pabst Brewing Company,* 90 Tex., 298, 38 S. W., 29, 750, 35 L. R. A., 241. There a brewing company, a Wisconsin corporation, made an agreement with a dealer in Texas to furnish a warehouse for the storage and sale of the beer of the former, in which it was provided that during the continuance of the contract the brewing company would not sell beer to any other party in the city where the dealer conducted his business, and that the latter would not sell any other beer to his trade than that purchased from the brewing company. It was held that this agreement was a combination, the tendency and purpose of which was to prevent competition in the sale or purchase of an article of commerce, and was within the purview of the Texas anti-trust statute and unlawful.

But we need no further authority as to the unlawful and criminal nature of this contract than our own statute, upon which the indictment of the plaintiffs in error is predicated. By its express terms, all arrangements made with a view to lessen and destroy competition, or which tend to lessen and destroy competition, and to control prices, are conspiracies against trade, unlawful, and void. Its broad and comprehensive provisions cover every conceivable case of an agreement or contract made to lessen or destroy competition and control prices.

Fourth. The next contention is that, conceding the facts proven would ordinarily establish a criminal con-

spiracy, the judgment against the plaintiff in error Holt must be reversed, because, after the acquittal of Rutherford, the preconcert of two or more necessary to constitute a conspiracy is not shown.

This contention is based upon the assumption that the Standard Oil Company and S. W. Love were not partners to the conspiracy proven.

It is said that the case is not made out against the Standard Oil Company, because Holt was its only agent who undertook to act for it in making the arrangements, and that he acted in excess of his authority, and, further, a corporation and its agent were only one, and both could not be considered in counting the two or more necessary to constitute a conspiracy.

Concurrence or combination of two or more persons or corporations must appear in order to constitute a conspiracy at common law and under the statute; but, as may well be inferred from what we have said, we think upon this record it must be held that all those charged in the indictment to have engaged in this conspiracy other than Rutherford, who must be eliminated under the verdict of not guilty as to him—that is, the Standard Oil Company, C. E. Holt, and S. W. Love—were parties to the unlawful arrangement proven in this case. We express no opinion as to whether J. E. Comer was a party, because there is no averment in the indictment to that effect.

That the Standard Oil Company is not subject to indictment under the statute because this punishment is

not imposed upon corporations violating it does not prevent it from being a party to a criminal conspiracy. Corporations are forbidden by the statute from making the agreements prohibited, and punishment imposed upon them and their officers and agents acting for them in effecting and carrying it into execution, when found guilty. The only distinction made in the statute between natural persons and corporations violating its provisions is in the punishment provided. The legislature had the power to enact that corporations could commit and be guilty of this offense, and has done so. This is conclusive of this question.

Corporations could, under the common law, commit crimes, both of nonfeasance and in the discharge of their common duties, and of misfeasance in the violation of statutes and rules of the common law, through their agents acting within the apparent scope of their authority and in the interest of their principal, the criminal intent of the agent being imputed to the corporation. Bishop's Cr. Law, sec. 417; *L. & N. R. R.* v. *State,* 3 Head, 523, 75 Am. Dec., 778; *Banner Pub. Co.* v. *State,* 16 Lea, 176, 57 Am. Rep., 216; *Com.* v. *Association,* 97 Ky., 325, 30 S. W., 626; *Stewart* v. *Waterloo Turn Verein,* 71 Iowa, 226, 32 N. W., 275, 60 Am. Rep., 786; *State* v. *Railroad Co.,* 15 W. Va., 362, 36 Am. Rep., 803; *Standard Oil Co.* v. *Comw.* (Ky.), 55 S. W., 8; *Norris* v. *State,* 25 Ohio St., 217, 18 Am. Rep., 291; *The Germania* v. *State,* 7 Md., 1; 10 Cyc. of Law and Proc., 1225, 1226; 7 Am. & E. Enc. Law (2d Ed.), 742, 830; *W. Va., etc., Co.* v.

*Standard Oil Co.,* 50 W. Va., 611, 40 S. E., 591, 56 L. R. A., 804, 88 Am. St. Rep., 895.

In the latter case, the authorities upon this subject are collated, and the reasons for holding corporations liable civilly and criminally for the acts of their agents set forth. It is there said:

"It is very clear that a corporation can be guilty of a combination or conspiracy with other corporations or persons aimed at and accomplishing the injury of other corporations or persons. It is a mere legal entity, impersonal, and in itself is incapable of so doing; but it is moved by human beings, is operated by human agents, and is thus an active person, not only for damage done in a breach of contracts, but for torts doing others harm. It will not avail either to say that it has no power within the scope of its authority to do wrong, and can do only the lawful things contemplated by the State in the bestowal of its charter, and that therefore, so far as its agents make it do wrong, its acts are outside the field of its legal power, *ultra vires,* and void, not binding the corporation, and thus that no tort binds it. Such was the old common-law rule, but it is completely overruled. 7 Am. and Eng. Ency. of Law (2d Ed.), 824. That doctrine may do as to contracts, but it cannot plead this doctrine to screen itself from its wrongs done to others against their will and rights. *Nat. Bank* v. *Graham,* 100 U. S., 699, 25 L. Ed., 750. In that case the court says: 'They are also liable for the acts of their servants, while engaged in the business of their principal . . . to the same extent

that individuals are liable under like circumstances. *Merchants' Bank* v. *State Bank,* 10 Wall. (U. S.), 604, 19 L. Ed., 1008. An action may be maintained against a corporation for its malicious or negligent torts, however foreign they may be to the objects of its creation, or beyond its granted powers. It may be sued for assault and battery, for fraud and deceit, for false imprisonment, for malicious prosecution, for nuisance, for libel. In certain cases it may be indicted for misfeasance or nonfeasance, touching duties imposed upon it in which the public are interested. Its offenses may be such as will forfeit its existence. *Phila., etc., R. R. Co.* v. *Quigley,* 21 How. (U. S.), 202, 16 L. Ed., 73; 2 Waite's Action and Defenses, 337-339; Angell & Ames on Corporations, secs. 186, 385; Cooley on Torts, 119, 120.' Manifestly, society must have protection against wrongful acts done by these corporate persons, now so numerous and forming so many varied business functions in our day, which so closely touch man in all his affairs. The case of *State* v. *Baltimore, etc., R. R. Co.,* 15 W. Va., 362, 36 Am. Rep., 803, strongly asserts this liability. So *Smith* v. *Norfolk, etc., R. R. Co.,* 48 W. Va., 69, 35 S. E., 834; *Gillingham* v. *Ohio, etc., R. R. Co.,* 35 W. Va., 588, 14 S. E., 243, 14 L. R. A., 798, 29 Am. St. Rep., 827. 'Upon like grounds, an action may be maintained against a corporation to recover damages caused by a conspiracy to which the corporation was a party.' 5 Thompson on Corporations, sec. 6315; *Buffalo* v. *Standard Oil Co.,* 106 N. Y., 669, 12 N. E., 826. If a corporation has no soul, it has

a mind, and can commit a tort involving a mental ele-ment. It can therefore have a bad, malicious motive through its representative agents acting in its transac-tion."

Where the offense with which the corporation is charged is the violation of a positive statute, the only intent necessary to the commission of the offense is the intent to do the prohibited act, and this corporations will be held to have when they act through their authorized agents and officers.

While this case is reversed as to the Standard Oil Company, it has not been acquitted of the charge of conspiracy. The case stands as to it as it does to S. W. Love; that is, they are both charged to have been parties to the conspiracy, but are not indicted. It is not nec-essary that the State proceed against all the members of the conspiracy, and there are often good reasons for not doing so.

We are also of the opinion that corporations, and their officers and agents, who conceive, effect, and carry out a conspiracy, can both be considered and counted in the two or more necessary to constitute an unlawful con-spiracy. The provisions of the statute upon which this case is based settle this question. Under section 3, all persons who may engage in a conspiracy, or shall, as principal, manager, director, agent, or in any other ca-pacity knowingly carry out the stipulations, purposes, prices, rates, or orders made in furtherance of the con-

spiracy, are made parties, and upon conviction subject to punishment.

We think, under this section, all persons who concur and participate in performing and making the unlawful agreements prohibited, whether as principals or agents, are conspirators, and therefore all must be counted in the two or more necessary to constitute a conspiracy. This appears from its plain terms, and especially the provision for the punishment of all engaged in the conspiracy, whether as principals or agents. It was the evident intent of the legislature to, as far as possible, prevent corporations from committing the abuses of trade denounced by the statute, by making their officers and agents, without whom they could not act, guilty of the same offense.

Corporations can unquestionably commit and be guilty of a criminal conspiracy denounced by the statute, as it so expressly enacts, and they, therefore, must be counted. The only question is whether their officers and agents, when they knowingly originate, effect, and carry out a criminal conspiracy, are to be considered parties to it, and held responsible for their corrupt and criminal actions. To hold that they are not would be to declare that the many able and experienced men who are now controlling and conducting the business of the corporations of this country as presidents or general managers, and the thousands of intelligent and skilled agents, mechanics, and operatives of every character in their employment, are mere tools and instrumentalities of their

employers, without minds, consciences and a sense of right and wrong and responsibility for their deeds. It would be to hold that they, by virtue of their corporate employment, have lost their identity, their individuality as men and citizens, and have been absorbed by a mere concept of the law, a conclusion which they would be the first to controvert and resent. If they should not be counted as parties necessary to constitute a conspiracy, they could not be guilty of a conspiracy, and the result would be that those whose minds conceived and planned and whose hands consummated a crime would not be within the reach of the law, and would escape punishment. This cannot be. No man is above the law of his country, and no one can so subordinate himself to the will of another, or the service or control of a corporation, as to be beneath them. It will be a fateful day for our institutions, founded as they are in part upon the right of independent thought and action and individual responsibility, when the doctrine that the thousands of officers and agents of the innumerable corporations, great and small, controlling almost all of the public utilities and the commerce of this country, acting within the apparent scope of their duties, are immune from the punishment provided by statute to restrain the rapacity and aggressions of their employer, is established. Then, indeed, would these great combinations be a menace to our form of government, and the prosperity and happiness of the great masses of our people.

We are of the opinion that, independent of statute upon principle and in furtherance of sound public policy, both corporations and their officers and agents who engage in the conspiracy must be held to be parties to it, and be counted in computing the necessary number to constitute it. There are respectable authorities which tend to this conclusion. *People* v. *Duke,* 19 Misc. Rep., 292, 44 N. Y. Supp., 336; *Samuels* v. *Oliver,* 130 Ill., 73, 22 N. E., 499; Eddy on Corporations, sec. 362.

Corporations, however, are only liable, civilly or criminally, for the acts of their agents who are authorized to act for them in the particular matter out of which the unlawful conduct with which they are charged grows, or in the business to which it relates. This must be so, otherwise their interest could be destroyed by conduct and acts which their officers and managers who control and dictate their policy never contemplated, by agents who were mere instrumentalities, knowing nothing and caring nothing about the policy or the real interest of the company. Holt may not have been an agent who was authorized to represent his employer in making an arrangement of the character negotiated by him in this case, although it is clear that, had he made a sale of oil in any county of the State where the company had not taken out license and paid the privilege tax imposed upon dealers in oils, the company would have been subject to indictment and conviction for such offense, because in this matter he did have authority to represent it.

But J. E. Comer, its special agent in Tennessee, was

the agent for whose wrongful acts in connection with the sale of its products in his territory it was responsible, civilly and criminally. He was, as far as we can see from this record, the chief agent of the company in Middle Tennessee. He was the general manager of the business of the company here, had charge of the marketing of its products, fixed the prices for which they were sold, controlled all other agents in this business, and dictated the general policy of the company in advancing its interest, the sale of its goods, and the protection of its trade. The traveling salesmen and local agents, like Holt and Rutherford, were required to report to him in writing, upon blanks furnished them for the purpose, the presence of other oil dealers or their representatives found in their territory, evidently that he might take such steps as he deemed proper and necessary to hold the trade of his principal or protect it from competition. This was what was done in the case under consideration. There is no doubt but that he authorized and directed Holt to proceed to Gallatin and there arrange to have the sales of oil made by the Evansville Oil Company countermanded. There is no doubt that he did this in order to destroy the competition that was threatened in the sale of the oil of his employer, the Standard Oil Company, then stored and exposed for sale at that point.

There is no positive evidence that he authorized Holt to give oil away in order to accomplish this; and he and Holt testify that he did not do so, and that it was unknown to him until it appeared in the public press and

he was informed of the facts by an agent of the Evansville Oil Company and by Rutherford, and that he then condemned the means by which the arrangement was effected, but not the arrangement.    But the best evidence of what his instructions to Holt were and the information he had of the transaction at the time it was made were the letters which he wrote to Holt directing him to go to Gallatin, and the daily and semiweekly reports made to him by Holt and Rutherford of what was done there, which were not produced, although admitted to be then in his possession.    He was aware of the value of such evidence, as he produced a copy of his letter to Holt, condemning the transaction, as evidence in behalf of the plaintiffs in error.    The presumption always is that competent and pertinent evidence within the knowledge or control of a party which he withholds is against his interest and insistence.    *Dunlap* v. *Haynes*, 4 Heisk., 476; *Kirby* v. *Tallmadge*, 160 U. S., 379, 16 Sup. Ct., 349, 40 L. Ed., 463; *Pacific Constr. Co.* v. *B. W. Co.*, 94 Fed., 180, 36 C. C. A., 153.

Holt testified, and in this case he was corroborated by Rutherford, that he intended to pay for the oil himself; but when the fact that the value of that given away was nearly equal to his monthly salary, and that he had never been required to pay it, are considered, this statement is difficult to believe, and was evidently discredited by the jury.    This, however, does not affect the question.

The gist of the crime committed is the arrangement

made to lessen, or which tended to lessen, competition. This is what caused the injury to the public, and what is prohibited. It is what they conspired to do. It was not necessary that the conspirators should have agreed upon the means by which the conspiracy was to be effected. The Standard Oil Company, through its special agent, one having authority to act for it and dictate its policy in all matters concerning the marketing of its oil in that territory, directed Holt to make the arrangement, and is presumed to have been present and assenting to the means used by its coconspirator to carry out the objects of this conspiracy. 2 Wharton's Cr. Law, 1397-1400; *Spies* v. *People* (Ill.), 12 N. E., 865, 3 Am. St. Rep., 320-482.

Although a previous contract or agreement is essential, it is not necessary that it appear that the conspirators came together and agreed upon the manner of carrying out the conspiracy; it is sufficient to prove that their . acts were done with a view to accomplish the purpose of the conspiracy. *United States* v. *Ridskopf,* 6 Biss., 259, Fed. Cas. No. 16-165; 6 A. & E. Enc. of Law (2d Ed.), 842.

In general, a conspirator is responsible for the means employed by his fellow conspirators in accomplishing the unlawful purpose, although not previously specifically agreed upon. *Spies* v. *People* (Ill.), 12 N. E., 865, 3 Am. St. Rep., 320; *Phillips* v. *State* (Tex. App.), 9 S. W., 557, 8 Am. St. Rep., 471; *Irvine* v. *State,* 104 Tenn.,

132-147, 56 S. W., 845; Eddy on Combinations, section 458; 1 Wharton on Criminal Law, section 220.

In the case of *Irvine* v. *State,* supra, two brothers agreed to chastise a party who had insulted their mother, and armed themselves for that purpose. One inflicted the punishment, while the other stood by. Neither intended to kill unless in self-defense. In the prosecution of their common design, one of the brothers shot and killed the assaulted party, and it was held by this court that both brothers were equally guilty, although one did not participate in the shooting, and was himself shot down and at the time disabled; the court holding that all who assembled themselves to enter into an agreement with the intent to commit a wrongful act, the execution whereof makes possible in the nature of things a crime not specifically designed, but incidental to that which was the act of the conspiracy, are responsible for such incidental crime.

And proof of an overt act is competent in cases of this kind, though the alleged preconceived plans did not necessarily include the commission of the act done, when such act is one which would tend, directly or indirectly, to accomplish the common purpose; and it is often convincing evidence of the existence of the combined intent and agreement. *State* v. *Ripley,* 31 Me., 386; *Martin* v. *State,* 89 Ala., 115, 8 South., 23, 18 Am. St. Rep., 91.

S. W. Love was also a party to this conspiracy within the meaning of this statute. He testified upon the witness stand, when introduced in behalf of the State, that

he made the arrangement when approached and asked
to do so by Holt, and that he received the consideration
contracted for, from the storage tank of the Standard
Oil Company at Gallatin. There is no question but that
he did it knowingly, and in order to carry out the pur-
poses of the Standard Oil Company and its representa-
tive, Holt. This intent and purpose were apparent and
obvious, and the injurious effect upon trade and the
public unmistakable. No intelligent business man could
be ignorant of these things. He was bound to know,
from the nature of this unusual transaction, that the
Standard Oil Company, or its representative, had a pur-
pose in giving the oil away; that that purpose was favor-
able to their own interest; and that the countermand of
the order he had given the Evansville Oil Company was
a furtherance of that purpose, and would tend to lessen
and destroy competition with the oil of the Standard
Oil company then stored and being sold at his place. He
had a right, it is true, to countermand the order, if that
was the understanding, implied or expressed, between
him and the Evansville Oil Company, but he had no
right to enter into an agreement with the Standard Oil
Company to do it. He lessened competition against the
oil of the latter. Neither the countermand of the order
nor the giving away of the oil were in themselves crimi-
nal, and either could have been done by the parties
acting without concert, but they could not agree to have
the order countermanded in consideration of a gift of oil

for the purpose of lessening competition, or if such countermand tended to effect that purpose.

In the case of *State* v. *Buchanan,* 5 Harris & J. (Md.), 517, 9 Am. Dec., 534, a leading case upon this subject, it is said:

"From all of which it results that every conspiracy to do an unlawful act for an illegal, fraudulent, malicious, and corrupt purpose, or for a purpose which has a tendency to prejudice the public in general, is at common law an indictable offense, though nothing be done in the execution of it, and, no matter by what means the conspiracy was intended to be effected, which may be perfectly indifferent, and makes no ingredient of the crime, and therefore need not be stated in the indictment."

The statute makes such an agreement unlawful and a crime. This involves no violation of the right of a party to dispose of his property in his discretion, or his constitutional right of freedom of contract. It is well settled that the States may restrain the right to contract in the reasonable exercise of the police power, as in this case, for the protection of the public health, morals, safety, and welfare. *Harbison* v. *Knoxville Iron Co.,* 103 Tenn., 422, 53 S. W., 955, 56 L. R. A., 316, 76 Am. St. Rep., 682; *Dayton* v. *Barton,* 103 Tenn., 604, 53 S. W., 970.

This has also been recently held in a case decided by the supreme court of the United States involving a criminal conspiracy formed in violation of a statute of the

State of Wisconsin.   Mr. Justice Holmes, speaking for the court in that case, said:

"It is urged, nevertheless, that the means intended to be used by this peculiar combination was simply the abstinence from making contracts; that a man's right to abstain cannot be infringed on the ground of motive; and, further, that it carries with it the right to communicate that intent to abstain to others, and to abstain in common with them.   It is said that if the statute extends to such a case it must be unconstitutional.   The fallacy of this argument lies in the assumption that the statute stands no better than if directed against the pure nonfeasance of singly omitting the contract.   The statute is directed against a series of acts, and acts several, the acts of combining with the intent to do other acts.   'The very plot is an act in itself.' * * * But an act which, in itself, is merely a voluntary muscular contraction, derives all its character from the consequences which will follow it, under the circumstances under which it was done.   When the acts consist of making a combination calculated to cause temporal damage, the power to punish such acts, when done maliciously, cannot be denied because they are to be followed and worked out by conduct which might have been lawful if not preceded by the acts.   No conduct has such an absolute privilege as to justify all possible schemes of which it may be a part. The most innocent and constitutionally protected of acts or omissions may be a step in the criminal plot, and, if it is a step in a plot, neither its in-

nocence nor the constitution is sufficient to prevent the punishment of the plot by law." *Aikens* v. *Wisconsin,* 195 U. S., 194, 25 Sup. Ct., 3, 49 L. Ed., 154.

It is unnecessary to review the case as to Holt. He confesses, in testifying for himself, the making of the agreement, and in substance that it was made to protect the oil of his employer from competition with that of the Evansville Oil Company, and that he knowingly carried out the terms and stipulations of the agreement. It is clear from his own statement that he conspired, as charged in the indictment, with his employer, the Standard Oil Company, acting through J. E. Comer, special agent, and S̆. W. Love, and there can be no doubt of his guilt. While he did this in pursuance of instructions received from a superior agent, and in his overzealousness to protect the trade and property of his employer, this cannot excuse him; obedience to orders of others will not excuse crime. If it would, there would be few cases of this kind in which the officers and agents of corporations could be convicted for violating the salutary statutes of the character of the one under which this prosecution was conducted, enacted by the federal and State legislatures for the prevention and punishment of abuses of trade and commerce, injurious alike to the public and individuals, which are now growing more frequent and being perpetrated by more powerful combination, and demand more prompt and drastic punishment than perhaps at any period in the history of the civilized world. It is true that he must be punished, and

Standard Oil Co. v. State.

in this case his principal escape, but this is not the fault of the courts.   The legislative branch of the government has not provided such punishment as he receives, for corporations, and the courts cannot amend or extend the statute.   A severe punishment against corporations for such acts is imposed by the statute, one doubtless which the principal fears greater and which is more far-reaching than the judgment pronounced against it by the trial court, and here held erroneous; that is, that it be prohibited from doing business within this State.

The judgment of the circuit court against C. E. Holt will be affirmed, with costs; that against the Standard Oil Company will be reversed.